**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GRITSTONE BIO, INC.,[1] | Case No. 24-12305 (KBO) |
| Debtor. | |

## DECLARATION OF VASSILIKI ("CELIA") ECONOMIDES IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF

I, Vassiliki ("Celia") Economides, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer ("CFO") and an Executive Vice President ("EVP") of the above-captioned debtor and debtor in possession, Gritstone bio, Inc., formerly known as Gritstone Oncology, Inc. ("Gritstone", the "Debtor" or the "Company"), and have served in these capacities since June 2021.

2.      Previously, I served as Senior Vice President, Strategy and External Affairs at Kezar Life Sciences, Inc., a public company targeting immune-mediated diseases and cancer. Prior to joining Kezar in 2019, I served as Vice President, Corporate Affairs at Aurinia Pharmaceuticals, Inc., a public company that delivered the first FDA-approved oral treatment (an immunotherapy) for lupus nephritis. Previously, I served as Director of Global Medical Affairs and Director of Clinical Operations at BioMarin Pharmaceutical, Inc., after the company's acquisition of Prosensa where I led Investor Relations and Corporate Communications. Earlier in my career, I led Investor

---

[1] The Debtor's mailing address is 4698 Willow Road, Pleasanton, CA 94588, and the last four digits of the Debtor's federal tax identification number is 9534.

Relations and Program Development at the Biotechnology Innovation Organization and worked at a healthcare-focused hedge fund and in financial services focusing on the biotech sector.

3.      I received a B.A. from McGill University and an M.P.H. in Health Policy and Management from Columbia University.

4.      On October 10, 2024 (the "Petition Date"), the Debtor commenced a case (the "Chapter 11 Case") by filing a petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

5.      I submit this declaration to provide an overview of the Debtor's business and the Chapter 11 Case and in support of the Debtor's "first day" applications and motions (collectively, the "First Day Pleadings"). I am over the age of 18, competent to testify, and authorized to submit this declaration on behalf of the Debtor.

6.      As a result of my roles as CFO and EVP, I am familiar with the Debtor's businesses, financial affairs, and day-to-day operations. Except as otherwise noted, I have personal knowledge of the matters set forth herein. All facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtor's senior management and the Debtor's employees, my review of relevant documents, and/or my opinion based on my experience and knowledge of the Debtor's operations and financial condition. In making this declaration, I have relied in part on information and materials that the Debtor's personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my

direction, and/or for my benefit in preparing this declaration.  If I were called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.

## **PRELIMINARY STATEMENT**

7.      Gritstone is a clinical-stage biotechnology company that aims to develop potent vaccines for oncology and infectious diseases.  The Company was founded in August 2015 and is headquartered in Emeryville, California, with an additional location in Massachusetts, and a manufacturing facility in Pleasanton, California. The Company is focused on developing next-generation vaccines aimed at treating cancers and treating and preventing infectious diseases by leveraging its proprietary technology platforms.  Gritstone's mission is to harness the power of the immune system through innovative vaccine technologies to improve patient outcomes across a range of serious diseases.

8.      Although Gritstone continues to receive encouraging data from its clinical studies and has received multiple indications of interest from potential pharmaceutical partners and existing and new investors, the development of its next-generation vaccines for cancer and infectious diseases requires substantial additional capital investment.  Despite its careful financial management, the Company continues to experience pressures related to its operational costs, clinical trial expenditures and the advancement of its programs through late-stage clinical development and commercialization.  Accordingly, the Company intends to utilize its Chapter 11 Case as a platform to attract and implement such needed investment.

9.      To familiarize the Court with the Debtor and the relief it seeks on the first day of this Chapter 11 Case, this declaration is organized in three sections. The first section provides

background information with respect to the Debtor's business and corporate history, as well as its prepetition capital structure. The second section describes the circumstances surrounding the commencement of this Chapter 11 Case and the Debtor's plan of action in this Chapter 11 Case. The last section sets forth the relevant facts in support of each of the First Day Pleadings.

## GENERAL BACKGROUND

### I.     THE DEBTOR'S BUSINESSES

####     A.     Overview

10.    Gritstone is developing next-generation vaccines for cancer and infectious diseases. The Company's approach seeks to generate potent and durable immune responses by leveraging the immune system's ability to recognize and destroy diseased cells by targeting select antigens.[2] Gritstone started with a focus on oncology and in 2020 extended its programs to include infectious diseases. The Company believes that activating and directing the immune system to disease targets could offer an important opportunity to improve patient outcomes and eradicate disease.

####     B.     History

11.    Since its inception, Gritstone has achieved several significant milestones:

- **2015:** Founded with a mission to develop potent vaccines for oncology.

- **2018:** Completed its Initial Public Offering (IPO) and listed on the Nasdaq Global Select Market exchange under the ticker symbol GRTS.

- **2019:** Launched the first clinical trials for its personalized cancer vaccine, GRANITE, and for its "off-the-shelf" cancer vaccine platform, SLATE.

---

[2] "Any substance that causes the body to make an immune response against that substance. Antigens include toxins, chemicals, bacteria, viruses, or other substances that come from outside the body. Body tissues and cells, including cancer cells, also have antigens on them that can cause an immune response. These antigens can also be used as markers in laboratory tests to identify those tissues or cells." https://www.cancer.gov/publications/dictionaries/cancer-terms/def/antigen (National Cancer Institute Dictionary of Cancer Terms).

- **2020:** Advanced its infectious diseases platform, initiating development of a next-generation COVID-19 vaccine (CORAL).

- **2021:** Entered into a collaboration with Gilead Sciences for $60 million up front and up to $725 million in milestones to advance a therapeutic HIV vaccine program. Initiated a Gritstone-sponsored Phase 1 boost clinical study evaluating its CORAL platform (CORAL-BOOST).

- **2022:**  Initiated a Phase 1 clinical study evaluating our CORAL platform in South Africa supported with funding from the Coalition for Epidemic Preparedness Innovations ("CEPI") (CORAL-CEPI).

- **2023**: Awarded contract with the Biomedical Advanced Research Development Authority ("BARDA") for up to $433 million to conduct a comparative Phase 2b clinical study evaluating a next-generation vaccine candidate against COVID-19.

- **2023-2024:** Presented promising clinical data for GRANITE in colorectal cancer.

**C.    Operations**

12.    Gritstone operates as a publicly traded company incorporated in Delaware. The

Company has no significant subsidiaries or affiliated entities affecting its operational framework.[3]

13.    As of the Petition Date, the Company operates from the following locations:

- **Emeryville, California (Headquarters):** Corporate operations and R&D.

- **Boston, Massachusetts:** Focus on R&D and business development.

- **Pleasanton, California (Manufacturing Facility):** Production of clinical-grade materials for trials.

14.    As of October 4, 2024, Gritstone employed 130 individuals, primarily engaged in

research, clinical development, and manufacturing. The Company's workforce is highly

specialized, with significant expertise in immunology, oncology, and infectious diseases.

**D.    Product Candidates**

---

[3] The Company has an inactive subsidiary in the United Kingdom.



15.  Gritstone, along with its collaborators such as BARDA, CEPI, the Gates Foundation,

Gilead Sciences, Inc., and the National Cancer Institute, is advancing a portfolio of product

candidates to treat and prevent viral diseases and solid tumors, specifically through developing and

commercializing vaccines for oncology and infectious diseases.

**Epitope Discovery for Genomes (EDGE™)**

16.     The first platform of Gritstone's immunotherapy requires an understanding of

antigens and neoantigens,[4] and specifically which ones will be transcribed, translated, processed

and presented on a cell surface by human leukocyte antigen (HLA) molecules;[5] and therefore will

be visible to T cells.[6] To accomplish this, Gritstone has developed EDGE™ (Epitope Discovery for

Genomes), a proprietary artificial intelligence driven platform to accurately identify T cell targets.

17.     Developing cancer immunotherapies that include tumor-specific neoantigens

presents a challenge due to their nature – tumors typically have hundreds of mutations, but only a

small percentage of those mutations result in true tumor-specific neoantigens that can be targeted by

the immune system. To address this challenge, Gritstone trained EDGE's novel integrated neural

network model architecture[7] with millions of datapoints from hundreds of tumor and normal tissue

---

[4] A neoantigen is "[a] new protein that forms on cancer cells when certain mutations occur in tumor DNA. Neoantigens may play an important role in helping the body make an immune response against cancer cells. Neoantigens used in vaccines and other types of immunotherapy are being studied in the treatment of many types of cancer." https://www.cancer.gov/publications/dictionaries/cancer-terms/def/neoantigen (National Cancer Institute Dictionary of Cancer Terms).

[5] A human leukocyte antigen is "[a] type of molecule found on the surface of most cells in the body. Human leukocyte antigens play an important part in the body's immune response to foreign substances. They make up a person's tissue type, which varies from person to person. Human leukocyte antigen tests are done before a donor stem cell or organ transplant, to find out if tissues match between the donor and the person receiving the transplant. Also called HLA and human lymphocyte antigen." https://www.cancer.gov/publications/dictionaries/cancer-terms/def/human-leukocyte-antigen (National Cancer Institute Dictionary of Cancer Terms).

[6] A T cell is "[a] type of white blood cell. T cells are part of the immune system and develop from stem cells in the bone marrow. They help protect the body from infection and may help fight cancer. Also called T lymphocyte and thymocyte." https://www.cancer.gov/publications/dictionaries/cancer-terms/def/t-cell (National Cancer Institute Dictionary of Cancer Terms).

[7] A neural network is a tool for deep learning inspired by the biology of our human brains, allowing computers to make connections with data and learn to improve from experience over time. Neural network architecture is the structure of a neural network, a map of the neural layers and processes." https://www.coursera.org/articles/neural-network-

samples from patients of various ethnicities. This enables Gritstone to use sequence data from a

patient's routine tumor biopsy to predict which mutations will generate tumor-specific neoantigens

most likely to be presented on the tumor cell surface by the HLA.  Predicting the neoantigens is

believed to be a critical step in creating individualized cancer vaccines.  Gritstone's EDGE has

shown a significant improvement in accuracy for predicting neoantigens in comparison with

publicly available approaches. Gritstone believes that mutations selected by the EDGE platform

have a much higher likelihood of being useful targets for immunization than mutations selected

using previous and/or publicly available methods.

18.     Vaccines against viruses ideally generate both neutralizing antibody responses to

whole proteins on the virus surface, and also T cell responses to the short fragments of viral

proteins which are displayed on the surface of virus-infected cells (once inside a cell, a virus is

invisible to antibodies which operate outside the cell). All viral proteins are foreign to the human

immune system, but only short fragments of proteins (peptides) are displayed on the cell surface by

HLA and visible to T cells. The specific fragments presented will vary between subjects depending

upon the HLA type of the subject (conceptually similar to someone's blood type but more

complex). Identification of key viral protein fragments that can be recognized and therefore

potentially targeted by the immune system is an output of Gritstone's EDGE platform.

### Proprietary Vaccine Platform

19.     The vaccine platform involves the ability to embed the antigen within the

Company's proprietary delivery systems or vectors, which are designed to stimulate the immune

---

architecture

system to attack and destroy diseased or infected cells by generating T cells and/or neutralizing antibodies ("nAbs"). Gritstone uses these proprietary vectors, chimpanzee adenovirus ("ChAd") and self-amplifying mRNA ("samRNA"), independently and in combination across the Company's clinical programs.

### Oncology

20.     By leveraging EDGE as well as its expertise in cancer genomics, Gritstone is advancing cancer vaccines designed to direct a robust immune response to neoantigens, developing two key classes of tumor-specific neoantigen product candidates to treat patients with cancer including:

     a.  GRANITE, an investigational and individualized immunotherapy program, and;
     b.  SLATE, an "off-the-shelf" immunotherapy program utilizing the same neoantigen identification capabilities and delivery system as GRANITE but containing a fixed set of neoantigens that are shared across a subset of cancer patients.

### a.  GRANITE



21.     Many tumor mutations are unique to each individual patient. For patients with neoantigens arising from patient-specific mutations, Gritstone believes that an immunotherapy

made specifically for each patient has the potential to drive a potent immune response. GRANITE, Gritstone's first oncology program, is the Company's investigational individualized immunotherapy program implemented through a personalized neoantigen-based vaccine.[8]

22.     For each patient, GRANITE starts with a routine clinical biopsy, which is then sequenced in-house and analyzed through the Company's proprietary EDGE™ platform to derive a set of predicted patient-specific neoantigens likely to be presented on the patient's tumor. Using these predicted neoantigens, the Company then designs and manufactures at its own biomanufacturing facility in Pleasanton, California, an individualized vaccine containing the relevant neoantigens to be administered by simple intramuscular injection. Gritstone's intent is to deliver the immunotherapy in a community oncology setting where a vast majority of cancer patients are treated.

23.     GRANITE is being evaluated in a randomized Phase 2 study as a maintenance treatment in patients with newly diagnosed, metastatic microsatellite-stable colorectal cancer ("MSS-CRC") who have completed standard of care induction therapy. GRANITE was granted Fast Track designation by the U.S. Food and Drug Administration for the treatment of MSS-CRC.

24.     On April 1, 2024, Gritstone announced preliminary interim results from its ongoing randomized Phase 2 study which suggested that GRANITE could drive meaningful clinical benefits

---

[8] Personalized cancer vaccines (PCVs) are ushering in a new era of immunotherapy and the potential proof-of-concept for neoantigen-based PCVs is growing, with multiple randomized studies ongoing, including from Moderna and BioNtech, as well as Gritstone.  See, e.g., Seclì L, Leoni G, Ruzza V, Siani L, Cotugno G, Scarselli E, D'Alise AM. Personalized Cancer Vaccines Go Viral: Viral Vectors in the Era of Personalized Immunotherapy of Cancer. Int J Mol Sci. 2023 Nov 22;24(23):16591. doi: 10.3390/ijms242316591. PMID: 38068911; PMCID: PMC10706435 ("The aim of personalized cancer vaccines is to elicit potent and tumor-specific immune responses against neoantigens specific to each patient and to establish durable immunity, while minimizing the adverse events. Over recent years, there has been a renewed interest in personalized cancer vaccines, primarily due to the advancement of innovative technologies for the identification of neoantigens and novel vaccine delivery platforms.").

in front-line MSS-CRC, the second leading cause of cancer-related deaths.  On September 30, 2024, Gritstone announced further interim data from this trial.

25.    The randomized Phase 2 trial (G0-010) is still in progress, data are trending well and need additional time to mature.  The September data (with a data cutoff date as of August 19, 2024) show that the overall PFS[9] hazard ratio is currently at 0.79, a positive trend from 0.82 in the data announced on April 1, 2024, translating to a >20% relative risk reduction of progression for GRANITE patients.  Also, thirty percent (30%) of vaccine recipients are currently clinically stable with undetectable or very low ctDNA – versus 17% of controls.[10]  Controls are expected to progress per prior chemotherapy trials.  The latest data are encouraging and are tracking with some investor expectations as analysts such as Evercore's Jonathan Miller have indicated that a PFS hazard ratio below 0.80 in the overall population would be a meaningful result.

26.    Based on positive findings observed in the trial among patients with low baseline ctDNA levels, the next projected randomized study is an important milestone and would focus treatment on metastatic CRC patients with low ctDNA at baseline as well as other settings such as adjuvant non-small cell lung cancer, and other warm/hot tumor types.  The next step is to engage in

---

[9] A hazard ratio is a "measure of how often a particular event happens in one group compared to how often it happens in another group, over time. In cancer research, hazard ratios are often used in clinical trials to measure survival at any point in time in a group of patients who have been given a specific treatment compared to a control group given another treatment or a placebo. A hazard ratio of one means that there is no difference in survival between the two groups. A hazard ratio of greater than one or less than one means that survival was better in one of the groups." https://www.cancer.gov/publications/dictionaries/cancer-terms/def/hazard-ratio (National Cancer Institute Dictionary of Cancer Terms).

[10] "Small pieces of DNA that are released into a person's blood by tumor cells as they die. A sample of blood can be used to look for and measure the amount of ctDNA and identify specific mutations (changes) in the DNA. ctDNA is being used as a biomarker to help diagnose some types of cancer, to help plan treatment, or to find out how well treatment is working or if cancer has come back. Also called circulating tumor DNA." https://www.cancer.gov/publications/dictionaries/cancer-terms/def/ctdna (National Cancer Institute Dictionary of Cancer Terms).

an end-of-Phase 2 discussion with the FDA and align on subsequent clinical trials and the associated budgets and timelines.

### b. SLATE



27.     Some cancer mutations, known as driver mutations, are shared between cancer patients. Neoantigens that arise from these driver mutations may be able to be used alongside other common antigen types to develop a cancer vaccine that is available "off-the-shelf."  SLATE is Gritstone's investigational off-the-shelf immunotherapy program.

28.     SLATE, the Company's second oncology program, utilizes the same antigen identification capabilities and delivery system as GRANITE but contains a fixed set of cancer antigens that are shared across a subset of cancer patients (rather than neoantigens unique to an individual patient).  A routine clinical biopsy can be used to identify patients that have common mutations within their tumor through commercially available genomic panel sequencing. This "off-the-shelf" therapy may be able to treat patients across multiple tumor types.

E.      **Infectious Disease**

29.     The CORAL program was initiated in 2020 in response to emerging limitations of first-generation COVID-19 vaccines, and today serves as proof-of-concept for Gritstone's ability to drive more potent and durable responses than those of current vaccines in prophylactic applications. As seen among COVID-19 and other infectious diseases, immune responses can vary and viruses mutate and neutralizing antibodies wane, necessitating re-dosing (boosters). The Company believes that an approach capable of inducing potent, broad immune response could have utility across a variety of viral and infectious diseases.

30.     Across multiple Phase 1 trials within CORAL, early results have demonstrated the potential ability of Gritstone's vaccines to elicit potent and durable neutralizing antibody responses, and potent cytotoxic cellular responses against key targets of the virus. These results have also provided early signals of the potential benefits of samRNA over first-generation mRNA vaccines such as those produced by Pfizer/BioNTech and Moderna.

F.      **Financial Condition**

31.     The Company recorded revenues of $900,000 and $2.7 million for the three and six months ended June 30, 2024, respectively, and $2 million and $4.4 million, respectively, for the same periods of the prior year.

32.     Gritstone's principal assets are its intellectual property portfolio and cash on hand.

33.     The Company has a portfolio of over 360 patent applications.  The portfolio covers Gritstone's core technologies relating to its EDGE target selection platform, as well as its vector systems, including its proprietary ChAd and samRNA vectors and their methods of use.  In

addition, Gritstone has filed patent applications covering various specific immunogen/payload designs which include, for example, its off-the-shelf oncology payloads and infectious disease-specific payloads such as influenza, coronaviruses, and human papilloma virus. In addition to core technologies, Gritstone has additional patent applications covering other technologies including antigen binding proteins (e.g., T cell receptors and bispecific antibodies) and CGMP manufacturing (e.g., formulation improvements for ChAd and samRNA storage).

34. The Company had unaudited and unreviewed cash on hand, cash equivalents and marketable securities in the aggregate approximate amount of $40 million as of August 31, 2024.

## G. **Employees**

35. The Company's leadership includes:

- **Andrew Allen, M.D., Ph.D. (President & Chief Executive Officer):** Co-founder with a background in clinical oncology and immunology and has served as President, CEO and a member of the Company's Board of Directors since August 2015. Prior to Gritstone, Dr. Allen co-founded and was CMO at Clovis Oncology and prior to that served as CMO at Pharmion (acquired by Celgene in 2008 for $2.9 billion). He also led oncology development at Chiron Corporation and was a global project head at Abbott Labs. He trained in Medicine at Oxford University, practiced as an academic nephrologist for several years, obtained a PhD in Immunology at Imperial College, and worked for several years at McKinsey & Company. He serves on the Board of Directors of Adaptimmune (NASDAQ:ADAP), Verge Genomics, Peptone and Revitope Oncology. He previously served on the Board of Directors of Epizyme (acquired by Ipsen in 2022) and Sierra Oncology.

- **Vassiliki ("Celia") Economides (Executive Vice President and Chief Financial Officer):** Serving as Executive Vice President and Chief Financial Officer since June 2021. Previously, Ms. Economides served as Senior Vice President, Strategy and External Affairs at Kezar Life Sciences, Inc., a public company targeting immune-mediated diseases and cancer. Prior to joining Kezar in 2019, Ms. Economides served as Vice President, Corporate Affairs at Aurinia Pharmaceuticals, Inc., a public company that delivered the first FDA-approved oral treatment (an immunotherapy) for lupus nephritis. Previously, she served as Director of Global Medical Affairs and Director of

Clinical Operations at BioMarin Pharmaceutical, Inc. after the company's acquisition of Prosensa where she led Investor Relations and Corporate Communications. Earlier in her career, Ms. Economides led Investor Relations and Program Development at the Biotechnology Innovation Organization (BIO) and worked at a healthcare-focused hedge fund and in financial services focusing on the biotech sector. Ms. Economides received a B.A. from McGill University and an M.P.H. in Health Policy and Management from Columbia University.

- **Matthew Hawryluk, Ph.D. (Executive Vice President and Chief Business Officer):** Serving as Executive Vice President and Chief Business Officer since October 2015. Prior to Gritstone, from April 2011 to October 2015, Dr. Hawryluk held positions of increasing responsibility at Foundation Medicine, a public molecular diagnostics company, most recently serving as Vice President, Corporate and Business Development. Previously, Dr. Hawryluk held roles in Business Development, Marketing and Product Management across multiple divisions of Thermo Fisher Scientific, Inc. Dr. Hawryluk currently serves on the Board of Directors of Predictive Oncology.  In May 2022, Dr. Hawryluk was named a 2022 Emerging Pharma Leader by Pharmaceutical Executive. Dr. Hawryluk received a B.S. from the University of Notre Dame, a Ph.D. in Cell Biology and Protein Biochemistry from the University of Pittsburgh School of Medicine and an M.B.A. at Carnegie Mellon University's Tepper School of Business as a Swartz Entrepreneurial Fellow.

- **Erin E. Jones, M.S. (Executive Vice President and Chief Operating Officer):** Serving as Executive Vice President and Chief Operating Officer since March 2021.  Previously, since May 2016, Mr. Jones had served as Executive Vice President of Global Regulatory Affairs and Quality. Prior to Gritstone, from July 2014 to April 2016, Mr. Jones served as Vice President, Global Head of Regulatory Affairs, Medical Writing, Pharmacology and Toxicology at Puma Biotechnology, a public biopharmaceutical company. Prior to Puma, Mr. Jones served as Director, Regulatory Affairs at BioMarin Pharmaceutical Inc. from July 2012 to July 2014. Earlier in his career, Mr. Jones held various positions at Genentech, a biotechnology corporation and subsidiary of Roche, including Head of Regulatory Intelligence and leader of the HER Franchise Regulatory Group. Mr. Jones received a B.S. in Microbiology and Chemistry from the University of Pittsburgh and an M.S. in Computer Systems from Pennsylvania State University.

- **Karin Jooss, Ph.D. (Executive Vice President and Head of Research & Development):**  Served as Executive Vice President and Head of Research and Development since March 2021. Previously, since April 2016, Dr. Jooss had served as Executive Vice President of Research and Chief Scientific Officer. Prior to Gritstone, from May 2009 to April 2016, Dr. Jooss was the Head of Cancer Immuno-Therapeutics in the Vaccine Immuno-Therapeutics

Department at Pfizer, Inc., a public pharmaceutical company, where she was also a member of the Vaccine Immuno-Therapeutics Leadership Team and served as Head of the Immuno-Pharmacology Team with responsibilities including Clinical Development. Prior to joining Pfizer, Dr. Jooss served at Cell Genesys, Inc. as Vice President of Research, from June 2005 to April 2009, and as Senior Director of Research, from July 2001 to June 2005. Dr. Jooss is on the Editorial Board of Molecular Therapy and the Journal of Gene Medicine, and is a member of the Immunology and Educational Committee of the American Society of Gene & Cell Therapy and the Industry Task Force of the Society for Immunotherapy of Cancer. Dr. Jooss currently serves on the Board of Directors of Fate Therapeutics, Inc. Dr. Jooss received her diploma in Theoretical Medicine from the University of Marburg in Germany, a Ph.D. in Molecular Biology from the University of Marburg in Germany and performed postgraduate work in Gene Therapy and Immunology at the University of Pennsylvania.

- **Stacy Proctor (Executive Vice President and Chief People Officer):** Served as Executive Vice President and Chief People Officer since March 2023.  Previously, since July 2021, Ms. Proctor served as Senior Vice President and Head of People.  Prior to joining Gritstone, Ms. Proctor served in Head of Human Resources positions for companies such as Energy Recovery, the Palo Alto Research Center (PARC), Mizuho OSI, and Associated Third Party Administrators (ATPA). Ms. Proctor has over 20 years of experience across several diverse industries with global and multiple worksites. Ms. Proctor is an experienced HR leader with a career of extensive collaboration as a trusted partner and advisor to achieve business goals. With broad business knowledge, HR acumen, and practical professionalism she brings a deep background in designing and implementing human capital strategy with a thoughtful approach to developing both the employees and the organization to realize the full potential, aligned to the Mission. Ms. Proctor is a Senior Professional in Human Resources (SPHR), has her Professional in Human Resources California Certification (PHR-CA), holds an MBA from the University of Phoenix, and a BA from the University of Utah.

36. As of the Petition Date, the Company's Board of Directors are:

- Shefali Agarwal, M.D., M.P.H. (President and Chief Executive Officer at Valerio Therapeutics)

- Andrew Allen, M.D., Ph.D. (Co-founder, President and Chief Executive Officer of Gritstone)

- Lawrence Cory, M.D. (Former President and Director, Fred Hutchinson Cancer Research Center)

- Clare Fisher (Senior Vice President of Business Development and Mergers & Acquisitions at BeiGene)

- Elaine V. Jones, Ph.D.

- Naiyer A. Rizvi, M.D. (Chief Medical Officer at Synthekine)

- Stephen Webster (Former Chief Financial Officer of Spark Therapeutics, Inc.)

## II. THE DEBTOR'S CAPITAL STRUCTURE

### A. Secured Debt

37. The Debtor, as borrower, Hercules Capital, Inc., as administrative and collateral agent (the "Prepetition Agent"), and Hercules Capital, Inc., Hercules Capital Funding Trust 2022-1, and Silicon Valley Bank, a division of First-Citizens Bank & Trust Company (successor by purchase to the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bridge Bank, N.A.), as lenders (together with the Prepetition Agent, the "Prepetition Secured Parties"), are parties to a Loan and Security Agreement, dated as of July 19, 2022, as amended (along with any ancillary documents thereto, the "Prepetition Loan Agreement"), which provides the Company a 60-month term loan facility for up to $80 million in borrowing capacity across five potential tranches.

38. The obligations under the Prepetition Loan Agreement are purportedly secured by first priority liens on certain of the Debtor's assets, including, but not limited to, goods, accounts, equipment, inventory, investment property, general intangibles (other than intellectual property), cash, deposit accounts, and rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights, in, intellectual property (the "Rights to Payment"), all as set forth in the Prepetition Loan Agreement.[11]

---

[11] Commercial tort claims are not covered by the security grant in favor of the Prepetition Agent.  Notably, the term

39.     As of the Petition Date, the outstanding principal obligations under the Prepetition Loan Agreement total approximately $40 million.

**B.**     **Unsecured Debt**

40.     As of the Petition Date, the Company estimates that it owes approximately $8.3 million in unsecured obligations, primarily to trade creditors arising in the ordinary course of its business operations.

**C.**     **Equity Interests**

41.     The Company's amended and restated certificate of incorporation, as amended, authorizes the issuance of 300,000,000 shares of common stock and 10,000,000 shares of preferred stock.

42.     As of the Petition Date, no shares of preferred stock were issued and outstanding.  As of September 30, 2024, there were 123,179,862 shares of common stock issued and outstanding.

---

"Collateral" as defined under the Prepetition Loan Agreement expressly *excludes* the Debtor's intellectual property, but purports to include the proceeds of such intellectual property or Rights to Payment, which the Debtor believes is ineffective to create a valid and enforceable security interest under the Uniform Commercial Code or section 552(b) of the Bankruptcy Code.

The Prepetition Loan Agreement further clarifies the definition of Collateral as follows:

Notwithstanding the foregoing, if a judicial authority (including a U.S. Bankruptcy Court) holds that a security interest in the underlying Intellectual Property is necessary to have a security interest in the Rights to Payment, then the Collateral shall automatically, and effective as of the date of this Agreement, include the Intellectual Property to the extent necessary to permit perfection of Agent's security interest in the Rights to Payment.

The Debtor submits that this "springing lien" on intellectual property is ineffective in the context of bankruptcy.  The Debtor is a technology company and its most valuable asset is intellectual property.

### EVENTS LEADING TO THE COMMENCEMENT
### OF THE CHAPTER 11 CASE

**A.**    **Financial and Operational Challenges**

43.    Like many clinical-stage biotechnology companies, Gritstone has faced the inherent challenges of securing sufficient funding to support its ambitious research and development efforts. Specifically, biotech companies face significant financial pressures due to the high costs of clinical trials, regulatory hurdles, and the lengthy timelines required to bring new therapies to market. Moreover, recent global economic uncertainties, including inflationary pressures, supply chain disruptions, and geopolitical tensions, have further complicated the operational and financial environment for biotech firms.  For example, interest rate hikes in response to post-COVID stimulus inflation have drawn a significant amount of capital away from certain cutting-edge industries, such as biotechnology.  All of these factors have led to increased scrutiny from investors, a tightening of available capital, and a need for companies to adopt more strategic approaches to resource allocation and operational efficiency.

44.    The Company's focus on advancing its programs required substantial investment, and the volatility of the biotech sector, exacerbated by the COVID-19 pandemic, has presented additional hurdles.  For example, in early 2024, Gritstone's collaboration with BARDA on its COVID-19 program faced delays due to regulatory and manufacturing challenges, which impacted the Company's financial outlook.  These challenges, combined with the delay in BARDA funding, led to a workforce reduction in February 2024, which reduced cash burn by approximately $4 million per quarter.

45.     Despite careful financial management, the Company has continued to experience pressures related to its operational costs, clinical trial expenditures, and the need for ongoing capital to advance its programs.  A recent April 2024 equity raise bolstered the Company's cash position, but additional capital will be required to support its clinical programs through to commercialization.

46.     While initial results relating to the Company's vaccine programs are promising, the path forward requires continued investment and strategic planning to bring these therapies to market.  As Gritstone prepares for additional Phase 2 trials or a potential Phase 3 trial and continues to develop its next-generation vaccines, the Company recognized the need to strengthen its financial foundation.

47.     To that end, over the past several weeks, the Company has: (a) retained the services of financial advisors to help develop strategies to manage its cash position and assess liquidity needs in the future; (b) consulted with restructuring counsel in order to explore options to strengthen the Company's financial condition and operations; (c) participated in a robust process led by its investment banker, Raymond James, to identify and evaluate strategic transactions and other financing options in the best interest of the Company and all of its stakeholders; (d) negotiated with a party interested in exploring both out-of-court and Court-approved acquisition transaction models; and (e) engaged in extensive discussions with the Prepetition Agent in an effort to give the Company relief from liquidity constraints and provide sufficient capital to fund its operations while it pursues a potential transaction with the 16 strategic or 8 financial parties that have executed full confidentiality agreements and are conducting due diligence, or with a third party.  Unfortunately, the Company's discussions with the Prepetition Agent did not yield a workable solution and, in order to explore potential investment and other options for greater liquidity, the Company commenced its Chapter 11 Case.

## EVIDENCE IN SUPPORT OF FIRST DAY PLEADINGS

48.     Contemporaneously herewith, the Debtor has filed a number of First Day Pleadings seeking orders that grant various forms of relief intended to stabilize the Debtor's business operations, facilitate the efficient administration of this Chapter 11 Case, and expedite a swift and smooth restructuring process.  On or around the Petition Date, the Debtor filed the following First Day Pleadings:

- **Cash Management Motion.** *Motion for Entry of Interim and Final Orders Authorizing the Debtor to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Granting Related Relief*

- **Tax Motion.** *Motion for Entry of Interim and Final Orders: (I) Authorizing the Payment of Certain Taxes and Fees; and (II) Granting Related Relief*

- **Utility Motion.** *Motion for Entry of Interim and Final Orders (I) Approving Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief*

- **Wages Motion.** *Motion for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtor to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*

- **Lease Rejection Motion.** *Motion for the Entry of an Order (A) Authorizing Rejection of Unexpired Lease of Non-Residential Real Property Nunc Pro Tunc to the Petition Date; (B) Abandoning any Remaining Personal Property Located at the Leased Premises; and (C) Granting Related Relief*

49.     Certain of the First Day Pleadings request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtor has narrowly tailored its

requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate. Other relief will be deferred for consideration at a later hearing.

50.     I am familiar with the information contained in each First Day Pleading and believe that the factual averments contained therein are true and correct to the best of my knowledge and that the relief sought in each such motion (a) is necessary to enable the Debtor to undertake certain postpetition activities in connection with its restructuring efforts, (b) constitutes a critical element for the Debtor to successfully implement the foregoing chapter 11 objectives, and (c) best serves the Debtor's estates and creditors' interests.

51.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  October 11, 2024

*/s/ Vassiliki Economides*
Vassiliki Economides
Chief Financial Officer