> **THE COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT FOR USE IN SOLICITATION TO PARTIES ENTITLED TO VOTE ON THE PLAN. THE PLAN PROPONENT IS NOT SOLICITING YOUR VOTE ON THE PLAN AT THIS TIME.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GRITSTONE BIO, INC.,[1] | Case No. 24-12305 (KBO) |
| Debtor. | |

### DISCLOSURE STATEMENT WITH RESPECT TO
### GRITSTONE BIO, INC.'S CHAPTER 11 PLAN OF REORGANIZATION

PACHULSKI STANG ZIEHL & JONES LLP
Debra I. Grassgreen (admitted *pro hac vice*)
John W. Lucas (admitted *pro hac vice*)
Malhar S. Pagay (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8750
Wilmington, Delaware 19899-8705
Tel: 302-652-4100
Fax: 302-652-4400
Email:       dgrassgreen@pszjlaw.com
             jlucas@pszjlaw.com
             mpagay@pszjlaw.com
             joneill@pszjlaw.com

Counsel to the Debtor and Debtor in Possession

Dated: January 15, 2025

---

[1] The Debtor's mailing address is 4698 Willow Road, Pleasanton, CA 94588, and the last four digits of the Debtor's federal tax identification number is 9534.

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

    A.        Solicitation Packages ........................................................................ 4

    B.        Only Impaired Classes Vote .............................................................. 4

    C.        Voting Procedures .............................................................................. 5

    D.        Plan Objection Deadline .................................................................... 5

    E.        Confirmation Hearing ........................................................................ 6

    F.        Overview of the Plan ......................................................................... 6

II. BACKGROUND AND CHAPTER 11 CASE ................................................... 7

    A.        Debtor's Businesses and Overview ................................................... 7

        1.  Overview .......................................................................................... 8

    B.        Operations ......................................................................................... 8

    C.        Product Candidates ........................................................................... 9

        1.  Epitope Discovery for Genomes (EDGE™) ..................................... 9

        2.  Proprietary Vaccine Platform ......................................................... 10

        3.  Oncology ........................................................................................ 10

    D.        Infectious Disease ........................................................................... 11

    E.        Prepetition Financial Condition ..................................................... 11

    F.        The Debtor's Capital Structure ....................................................... 12

        1.  Secured Debt ................................................................................... 12

        2.  Unsecured Debt ............................................................................... 12

        3.  Equity Interests ............................................................................... 12

    G.        Events Leading to the Commencement of the Chapter 11 Case ......... 13

    H.        Events During the Chapter 11 Case ................................................. 14

        1.  First Day and Other Early Relief ..................................................... 14

        2.  DIP Financing and Cash Collateral Relief ...................................... 14

        3.  Debtor's Retention of Professionals and Personnel .......................... 15

        4.  Formation of the Committee ............................................................ 16

        5.  Postpetition Sales of Debtors' Assets .............................................. 16

        6.  Schedules and Statement of Financial Affairs .................................. 17

        7.  Debtor's KEIP and KERP ............................................................... 17

        8.  Worthless Stock Notice Procedures ................................................. 17

III. SUMMARY OF THE PLAN .......................................................................... 18

    A.        General ............................................................................................ 18

    B.        Treatment of Unclassified Claims ................................................... 18

    C.        Classification and Treatment of Claims and Equity Interests ............. 19

    D.        Provisions for Implementation of Plan ............................................. 23

        1.  Reorganization of the Debtor ......................................................... 23

        2.  Liquidating Trust ........................................................................... 23

        3.  Appointment of Officers and Directors of the Reorganized Debtor .. 27

        4.  Binding Effect ................................................................................ 28

        5.  Cancellation of Notes, Instruments, Debentures and Equity Securities
        28

    E.        Executory Contracts and Unexpired Leases ..................................... 28

1. Assumption and Rejection of Executory Contracts and Unexpired Leases 28
2. Rejection Claims; Cure of Defaults .................................................. 29
F. Provisions Governing Distributions.................................................. 30
1. Time and Method of Distributions.................................................... 30
2. Reserve for Disputed Claims........................................................... 31
3. Manner of Distribution Under Plan and Liquidating Trust................ 31
4. Delivery of Distributions................................................................. 31
5. Undeliverable Distributions ............................................................ 31
6. Compliance with Tax Requirements/Allocation ............................... 32
7. Time Bar to Cash Payments ............................................................ 32
8. Distributions After Effective Date .................................................. 32
9. Fractional Dollars; De Minimis Distributions.................................. 32
10. Setoffs/Recoupment ...................................................................... 33
11. Preservation of Subordination Rights by Estate............................. 33
G. Procedures for Resolution of Disputed, Contingent and Unliquidated Claims 33
1. Prosecution of Objections to Disputed Claims ................................. 33
2. Estimation of Claims...................................................................... 34
3. Controversy Concerning Impairment................................................ 34
4. Payments and Distributions on Disputed Claims.............................. 34
H. Conditions Precedent to Confirmation and the Effective Date........... 34
1. Conditions Precedent to Confirmation.............................................. 34
2. Conditions Precedent to Effective Date ........................................... 35
3. Waiver of Conditions Precedent ...................................................... 36
4. Effect of Non-Occurrence of Effective Date..................................... 36
I. Settlement, Discharge, Release, Exculpation, Injunctive and Related Provisions 36
1. Compromise and Settlement of Claims, Equity Interests, and Controversies ................................................................................. 36
2. Discharge of Claims and Termination of Interests............................ 37
3. Releases by Holders of Claims ........................................................ 37
4. Injunction ..................................................................................... 38
5. Releases by the Debtor and its Estate.............................................. 39
6. Necessity and Approval of Releases and Injunctions ....................... 40
7. Exculpation.................................................................................... 40
J. Vesting and Preservation of Certain Causes of Action...................... 40
1. Vesting of the Vested Causes of Action............................................ 40
2. Reservation of Rights Regarding Vested Causes of Action............... 41
3. Covenant Not to Execute on Judgment ............................................ 41
K. Retention of Jurisdiction ................................................................. 41
L. Miscellaneous Provisions................................................................. 41
1. Immediate Binding Effect ............................................................... 41
2. Plan Supplement............................................................................ 42
3. Payment of Statutory Fees and Provision of Reports........................ 42
4. Plan Modification/Amendment ........................................................ 42

4897-3798-2723.22 32903.00002

Subject to the limitations contained in the Plan: .................................................. 42
    5. Revocation of Plan ............................................................................. 43
    6. Successors and Assigns ...................................................................... 43
    7. Reservation of Rights ......................................................................... 43
    8. Good Faith ......................................................................................... 44
    9. Section 1146 Exemption .................................................................... 44
    10. Further Assurances ............................................................................. 44
    11. Post-Effective Date Fees and Expenses ............................................. 44
    12. Conflicts ............................................................................................ 44
    13. Term of Injunctions or Stays ............................................................. 45
    14. Closing of the Chapter 11 Case ......................................................... 45
    15. Change of Control Provisions ............................................................ 45
IV. VOTING REQUIREMENTS; ACCEPTANCE  AND CONFIRMATION OF THE PLAN    45
    A. Parties in Interest Entitled to Vote ..................................................... 46
    B. Classes Impaired Under the Plan ....................................................... 46
    C. Voting Procedures and Requirements ................................................ 46
    D. Confirmation Standards ..................................................................... 47
    E. Best Interests Test .............................................................................. 48
    F. Liquidation Analysis ......................................................................... 48
    G. Feasibility .......................................................................................... 49
    H. Acceptance by Impaired Classes ....................................................... 49
    I. Compliance with the Applicable Provisions of the Bankruptcy Code 50
II. ALTERNATIVES TO CONFIRMATION AND  CONSUMMATION OF THE PLAN    50
III. RISK FACTORS ................................................................................................. 51
    A. Risks Relating to Confirmation and Consummation of the Plan ........ 51
      1. Parties in Interest May Object to Classification of Claims and Interests 51
      2. The Debtor May Object to a Claim or Equity Interest ...................... 51
      3. The Debtor May Fail to Satisfy the Vote Requirement .................... 51
      4. Plan May Not Be Accepted, Confirmed or Consummated ................ 52
      5. Non-Consensual Confirmation of the Plan May Be Necessary ........ 52
    B. Risks Relating to the Chapter 11 Process .......................................... 53
      1. The Debtor's Exclusivity Period May Terminate ............................. 53
      2. Continuation of the Chapter 11 Case May Harm the Debtor's Estate 53
      3. The Chapter 11 Case May Be Converted to a Case Under Chapter 7 53
    C. Risks Relating to Recoveries Under the Plan ..................................... 53
    D. Risks Relating to the Reorganized Debtor .......................................... 53
      1. The Reorganized Debtor May Not Be Able to Achieve Its Projected Financial Results ................................................................................. 54
      2. The Reorganized Debtor May Not Be Able to Generate Sufficient Cash to Service All of Its Indebtedness ............................................. 54
      3. The Debtor Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Case ................................................................... 54

4.   Financial Results May Be Volatile and May Not Reflect Historical Trends     54

IV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ....... 55

A.        Certain U.S. Federal Income Tax Consequences................................ 55
B.        Tax Consequences in Relation to the Debtor..................................... 56
C.        Tax Consequences for U.S. Holders of Certain Claims...................... 57
D.        Tax Consequences in Relation to the Liquidating Trust.................... 58
E.        Information Reporting and Withholding ............................................ 61

V. RECOMMENDATION .......................................................................................... 61

iv

# I.

## INTRODUCTION

Gritstone bio, Inc. (the "Debtor" or "Company"), has filed the proposed *Gritstone bio, Inc.'s Plan of Reorganization* (as may be amended or modified, the "Plan"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A copy of the Plan is attached hereto as **Exhibit A**.[2] The Debtor hereby submits this Disclosure Statement with respect to the Plan (as may be amended or modified, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances or rejections of the Plan from certain Holders of Claims against the Debtor.

On [_____ ___], 2025, the Court entered the Order [(*I) Approving the Disclosure Statement; (II) Scheduling a Plan Confirmation Hearing and Approving Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Forms of Ballot; and (V) Granting Related Relief*], which granted approval of the Disclosure Statement and approved of the forms of Plan ballots and notices, as well as set [_____ ___, 2025, at __:_____ __.m.] (Eastern Time) as the time for the hearing to confirm the Plan.

If confirmed and consummated, the Plan will implement the reorganization of the Debtor, with it emerging from bankruptcy and continuing to operate its business as the Reorganized Debtor with a completely restructured balance sheet. All of the property of the Estate and of the Debtor, including the Retained IP, shall vest automatically in the Reorganized Debtor free and clear of any and all Claims, Liens and Equity Interests, except for those Claims and Liens expressly provided for in the Plan, excluding any asset that is expressly excluded or disclaimed and the Liquidating Trust Assets. For the avoidance of doubt, the Reorganized Debtor shall not assume and will have no liability for any claim for indemnity, contribution, advancement or reimbursement asserted by or on behalf of any officer or director who served in such role prior to the Effective Date.

Distributions to creditors will be generally in accordance with the priority scheme under the Bankruptcy Code, subject to the terms of the Plan, with:

(i)     the Holders of the Prepetition DIP Financing Claims to (a) receive Cash in an amount equal to $16,725,000 on a Pro Rata basis, and (b) convert $5,375,000 of such claims into the New Equity Interests on a Pro Rata basis;

(ii)     Other Administrative Expense Claims to be paid in full on the Effective Date or such later date the claim becomes due and payable in the ordinary course of business;

(iii)     Priority Tax Claims to be paid in full in quarterly payments over five years;

(iv)     the Prepetition Secured Claims to be paid $400,000 on a Pro Rata basis, provided that the Holders of the Prepetition Secured Claims shall have Class 5 Allowed General Unsecured Claims with respect to the deficiency of such Prepetition Secured Claims (to the extent if qualifies as a Prepetition Lenders' Deficiency Claim in accordance with

---

[2] Capitalized terms used herein that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Bankruptcy Code section 506(a)) in an amount not to exceed $17,852,589 on a Pro Rata basis;

(v)    Other Secured Claims to be paid in cash, to receive the relevant collateral, or otherwise be unimpaired;

(vi)    Secured Tax Claims (held by Governmental Units) to be paid in full in quarterly payments over five years;

(vii)    Priority Non-Tax Claims (to the extent they have not already been satisfied pursuant to prior Bankruptcy Court order) to be paid in deferred cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claim (or as otherwise permitted pursuant to Bankruptcy Code section 1129(a)(9)(B)), such payments to commence on the later of fifteen days following the Effective Date or after such claim becomes an Allowed Claim;

(viii)    General Unsecured Claims (who do not elect Convenience Claim treatment on account of their Allowed Unsecured Claim) to receive the 100% of the Liquidating Trust Interests on a Pro Rata basis;

(ix)    Convenience Claims (which are Claims that would otherwise be a Class 5 General Unsecured Claim that is Allowed in an amount of $75,000 or less) to receive twenty percent (20%) of the Allowed amount of such Claim, provided that the aggregate amount of distributions on account of Allowed Convenience Claims cannot exceed the Convenience Claim Cap;

(x)    Subordinated Claims to receive no distributions; and

(xi)    Equity Interests to be cancelled and receive no distributions.

The Debtor seeks Bankruptcy Court approval of the Plan.  Before soliciting acceptances of a proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan.  This Disclosure Statement is being submitted in accordance with such requirements.  This Disclosure Statement includes, without limitation, information about:

- the Debtor's corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article II);
- events leading to the Chapter 11 Case (Article II);
- significant events in the Chapter 11 Case (Article II);
- the classification and treatment of Claims and Interests under the Plan (Article III); including who is entitled to vote and how to vote on the Plan (Article IV);
- certain important effects of Confirmation of the Plan (Articles VI and VII);
- releases contemplated by the Plan (Article III);
- the statutory requirements for confirming the Plan (Article IV);
- certain risk factors Holders of Claims should consider before voting to accept or

reject the Plan and information regarding alternatives to Confirmation of the Plan (Article V and VI); and

- certain United States federal income tax consequences of the Plan (Article VII).

In light of the foregoing, the Debtor believes this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code. Pursuant to section 1125(a)(1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."

All creditors entitled to vote to accept the Plan should return their Ballots (as defined herein), so as to be actually received by the Claims Agent no later than [_____], 2025, at 4:00 p.m. prevailing Eastern Time. Assuming the requisite acceptances to the Plan are obtained, the Debtor will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The Plan and all documents to be executed, delivered, assured, and/or performed in connection with the consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

NOTHING CONTAINED IN THIS DOCUMENT SHALL CONSTITUTE AN OFFER, ACCEPTANCE, OR A LEGALLY BINDING OBLIGATION OF THE DEBTOR OR ANY OTHER PARTY IN INTEREST, SINCE THIS DISCLOSURE STATEMENT AND THE PLAN IT SUPPORTS REMAINS, *INTER ALIA*, SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED HEREIN IS PRELIMINARY AND DEVELOPMENTS MAY OCCUR THAT REQUIRE MODIFICATIONS OR ADDITIONS TO, OR DELETIONS FROM, THIS DISCLOSURE STATEMENT AND THE PLAN IT SUPPORTS. [THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.]

THIS DISCLOSURE STATEMENT AND THE PLAN IT SUPPORTS ARE THE ONLY DOCUMENTS THAT CREDITORS AND OTHER PARTIES IN INTEREST SHOULD CONSIDER IN CONNECTION WITH CONFIRMATION OF THE PLAN, INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN. NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER

ACCEPTANCE OR REJECTION OF THE PLAN, NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT.

THE DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY. AFTER CAREFULLY REVIEWING THESE DOCUMENTS, IF YOU ARE A CLAIM HOLDER ENTITLED TO VOTE, PLEASE INDICATE YOUR VOTE WITH RESPECT TO THE PLAN ON THE ENCLOSED BALLOT AND RETURN IT IN THE ENVELOPE PROVIDED.

A.     **Solicitation Packages**

On [_____ ____], 2025, the Bankruptcy Court entered an order approving the Disclosure Statement (the "Disclosure Statement Order"). Holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (collectively, the "Solicitation Package"), including:

- the Disclosure Statement, as approved by the Bankruptcy Court (with all exhibits thereto);
- the Plan (Exhibit A to the Disclosure Statement);
- the Disclosure Statement Order (without exhibits thereto);
- the Solicitation Procedures;
- the Combined Hearing Notice;
- an appropriate Ballot with voting instructions with respect thereto, together with a pre-addressed return envelope;
- a cover letter from the Debtor (1) describing the contents of the Solicitation Package, and (2) urging the Holders of Claims in the Voting Classes to vote to accept the Plan; and
- any supplemental documents the Debtor may file with the Bankruptcy Court prior to solicitation or that the Bankruptcy Court orders to be made available.

B.     **Only Impaired Classes Vote**

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under the Plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan and shall not be afforded an opportunity to vote to accept or reject the Plan.

Under the Plan, Claims and Equity Interests in Classes 1, 3, 4, 5 and 6 are Impaired. Holders of Subordinated Claims in Class 7 are Impaired but will receive no distribution, and, accordingly, such claimants are deemed to reject the Plan. Holders of Equity Interests in Class 8

4

are Impaired but will receive no distribution, and, accordingly, such Equity Interest holders are deemed to reject the Plan.    ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED TO HOLDERS OF CLAIMS IN CLASS 1 (PREPETITION SECURED CLAIMS), CLASS 3 (SECURED TAX CLAIMS), CLASS 4 (PRIORITY NON-TAX CLAIMS), CLASS 5 (GENERAL UNSECURED CLAIMS) AND CLASS 6 (CONVENIENCE CLAIMS).

## C.    Voting Procedures

The deadline to vote on the Plan is [_____ ____], 2025, at 4:00 p.m., prevailing Eastern Time (the "Voting Deadline").  All votes to accept or reject the Plan must be received by the Debtor's voting agent, Verita Global (the "Voting Agent") by the Voting Deadline.

Ballots must be actually received by the Voting Agent by the Voting Deadline at the following address, whether sent by first class mail, personal delivery, or overnight courier:

**Gritstone Bio, LLC**
**c/o Verita Global**
**222 N. Pacific Coast Hwy.**
**El Segundo, CA 90245**

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate ballot.  All ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each ballot; (b) overnight delivery; or (c) personal delivery, so that the ballots are actually received by the Voting Agent no later than the Voting Deadline at the return address set forth in the applicable ballot.  Any ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted. Ballots received by facsimile or by electronic means will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one ballot for each Claim held by such Holder.  By signing and returning a ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtor that no other ballots with respect to such Claim has been cast or, if any other ballots have been cast with respect to such Claim, such earlier ballots are superseded and revoked.

All ballots will be accompanied by return envelopes.  It is important to follow the specific instructions provided on each ballot, as failing to do so may result in the ballot not being counted.

## D.    Plan Objection Deadline

The Bankruptcy Court has established **[_____ ____], 2025, at 4:00 p.m.**, prevailing Eastern Time, as the deadline to object to confirmation of the Plan (the "Plan Objection Deadline"). All such objections must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in interest in accordance with the Disclosure Statement Order and Solicitation Procedures so that they are actually received on or before the Plan Objection Deadline.  The Debtor

5

believes that the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtor, and other parties in interest reasonable time to consider the objections to the Plan before the Confirmation Hearing.

## E.   **Confirmation Hearing**

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for [_____, 2025, at __:__ __.m.] (Eastern Time) in the Bankruptcy Court, located at 824 N. Market Street, 6th Floor, Courtroom 3, Wilmington, DE 19801 (the "Confirmation Hearing"). The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest. The Bankruptcy Court, in its discretion and before a Confirmation Hearing, may put in place additional procedures governing such hearing. The Plan may be modified, if necessary, before, during, or as a result of the hearing to confirm the Plan without further notice to parties in interest, subject to the terms of the Plan.

## F.   **Overview of the Plan**

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN. CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF.

If confirmed and consummated, the Plan will implement the reorganization of the Debtor, with it emerging from bankruptcy and continuing to operate its business as the Reorganized Debtor. As of the Effective Date, the Reorganized Debtor will have a restructured balance sheet through a debt-to-equity conversion, and a Liquidating Trust with certain assets will be established for the benefit of General Unsecured Creditors.

Distributions to creditors will be generally in accordance with the priority scheme under the Bankruptcy Code, subject to the terms of the Plan: (i) the Holders of the DIP Financing Claims shall (a) receive Cash in an amount equal to $16,725,000 on a Pro Rata basis and (b) convert $5,375,000 of such claims into the New Equity Interests on a Pro Rata basis; (ii) the Holders of Other Administrative Expense Claims shall be paid in full on the Effective Date or such later date the claim becomes due and payable in the ordinary course of business; (iii) the Holders of Priority Tax Claims shall be paid in full in quarterly payments over five years; (iv) the Holders of the Prepetition Secured Claims shall be paid consistent with the Sale Order [Docket No. 288]; (v) the Holders of Other Secured Claims shall be paid in cash, receive the relevant collateral, or otherwise be unimpaired; (vi) the Holders of Secured Tax Claims (held by Governmental Units) shall be paid in full in quarterly payments over five years; (vii) the Holders of Priority Non-Tax Claims (to the extent they have not already been satisfied pursuant to prior Bankruptcy Court order) shall be paid in deferred cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claim (or as otherwise permitted pursuant to Bankruptcy Code section 1129(a)(9)(B)), such payments to commence on the later of fifteen days following the Effective Date or after such claim becomes an Allowed Claim; (viii) the Holders of General Unsecured Claims shall receive 100% of the Liquidating Trust Interests; (vi) the Holders of Subordinated Claims shall receive no

4897-3798-2723.22 32903.00002

distributions; and (ix) Equity Interests shall be cancelled.

Set forth below is a table summarizing the classification of and estimated recoveries on account of Allowed Claims and Equity Interests under the Plan.  The actual distributions may differ from those set forth in the table depending on the amount of Claims ultimately allowed in each category or Class and the extent of Liquidating Trust Assets ultimately available for distribution[3].

| DESCRIPTION/CLASS | ESTIMATED ALLOWED AMOUNT | ESTIMATED DISTRIBUTION (%) |
|---|---|---|
| Other Administrative Expense Claims | $107,640[4] | 100% |
| Priority Tax Claims | $0 | 100% |
| Class 1 Prepetition Secured Claims | $400,000[5] | 100% |
| Class 2 Other Secured Claims | $4,607,530 | 100% |
| Class 3 Secured Tax Claims | $0 | 100% |
| Class 4 Priority Non-Tax Claims | $0 | 100% |
| Class 5 General Unsecured Claims | $33,000,000 (estimated) | 5.2% cash plus Proceeds from Litigation Recoveries |
| Class 6 Convenience Claims | $1,700,000 | 20%[6] |
| Class 7 Subordinated Claims | TBD | 0% |
| Class 8 Equity Interests | N/A | 0% |

## II.
## BACKGROUND AND CHAPTER 11 CASE

A.    **Debtor's Businesses and Overview**

---

[3] The bar date for filing Claims and certain Administrative Expense Claims has not yet lapsed as of the filing of this Disclosure Statement, and thus the actual estimated allowed amounts provided herein may be materially different as proofs of claim are filed and the claims reconciliation process is undertaken.

[4] [This figure assumes that known Other Administrative Expense Claims, including professional fee claims, incurred during the Chapter 11 Case are fully funded and/or paid by the Debtor prior to the Effective Date pursuant to applicable Court orders.]

[5] Hercules asserts a claim of $17,852,589 and has agreed to a settlement of its Secured Claim in the amount of $400,000 and a Class 5 deficiency claim of $17,452,589.

[6] Recovery subject to dilution from creditors opting for treatment within Class 6.

4897-3798-2723.22 32903.00002

### 1.    Overview

Prior to the Petition Date, Gritstone was a clinical-stage biotechnology company that aimed to develop potent vaccines for oncology and infectious diseases.  The Company was founded in August 2015, headquartered in Emeryville, California, with an additional location in Massachusetts and a manufacturing facility in Pleasanton, California.

The Company was focused on developing next-generation vaccines aimed at treating cancers and treating and preventing infectious diseases by leveraging its proprietary technology platforms.  Gritstone's mission was to harness the power of the immune system through innovative vaccine technologies to improve patient outcomes across a range of serious diseases. The Company's approach sought to generate potent and durable immune responses by leveraging the immune system's ability to recognize and destroy diseased cells by targeting select antigens. Gritstone started with a focus on oncology and in 2020 extended its programs to include infectious diseases. The Company believes that activating and directing the immune system to disease targets could offer an important opportunity to improve patient outcomes and eradicate disease.

Since its inception, Gritstone achieved a number of significant milestones:

- 2015: Founded with a mission to develop potent vaccines for oncology.
- 2018: Completed its Initial Public Offering (IPO) and listed on the Nasdaq Global Select Market exchange under the ticker symbol GRTS.
- 2019: Launched the first clinical trials for its personalized cancer vaccine, GRANITE, and for its "off-the-shelf" cancer vaccine platform, SLATE.
- 2020: Advanced its infectious diseases platform, initiating development of a next-generation COVID-19 vaccine (CORAL).
- 2021: Entered into a collaboration with Gilead Sciences for $60 million up front and up to $725 million in milestones to advance a therapeutic HIV vaccine program.  Initiated a Gritstone-sponsored Phase 1 boost clinical study evaluating its CORAL platform (CORAL-BOOST).
- 2022:  Initiated a Phase 1 clinical study evaluating our CORAL platform in South Africa supported with funding from the Coalition for Epidemic Preparedness Innovations ("CEPI") (CORAL-CEPI).
- 2023: Awarded contract with the Biomedical Advanced Research Development Authority ("BARDA") for up to $433 million to conduct a comparative Phase 2b clinical study evaluating a next-generation vaccine candidate against COVID-19.
- 2023-2024: Presented promising clinical data for GRANITE in colorectal cancer.

### B.    Operations

Incorporated in Delaware, the Company has no significant subsidiaries or affiliated entities affecting its operational framework.

As of the Petition Date, the Company operated from the following locations:

- Emeryville, California (Headquarters): Corporate operations and R&D.

- Boston, Massachusetts: Focus on R&D and business development.
- Pleasanton, California (Manufacturing Facility): Production of clinical-grade materials for trials.

As of October 4, 2024, Gritstone employed approximately 130 individuals, primarily engaged in research, clinical development, and manufacturing. The Company's workforce was highly specialized, with significant expertise in immunology, oncology, and infectious diseases.

## C.    Product Candidates

Gritstone, along with its collaborators such as BARDA, CEPI, the Gates Foundation, Gilead Sciences, Inc., and the National Cancer Institute, advanced a portfolio of product candidates to treat and prevent viral diseases and solid tumors, specifically through developing and commercializing vaccines for oncology and infectious diseases.

### 1.    Epitope Discovery for Genomes (EDGE™)

The first platform of Gritstone's immunotherapy requires an understanding of antigens and neoantigens[7], and specifically which ones will be transcribed, translated, processed and presented on a cell surface by human leukocyte antigen (HLA) molecules[8]; and therefore will be visible to T cells[9]. To accomplish this, Gritstone developed EDGE™ (Epitope Discovery for Genomes), a proprietary artificial intelligence driven platform to accurately identify T cell targets.

Developing cancer immunotherapies that include tumor-specific neoantigens presents a challenge due to their nature – tumors typically have hundreds of mutations, but only a small percentage of those mutations result in true tumor-specific neoantigens that can be targeted by the immune system. To address this challenge, Gritstone trained EDGE's novel integrated neural network model architecture[10] with millions of datapoints from hundreds of tumor and normal tissue samples from patients of various ethnicities. This enabled Gritstone to use sequence data from a

---

[7] A neoantigen is "[a] new protein that forms on cancer cells when certain mutations occur in tumor DNA. Neoantigens may play an important role in helping the body make an immune response against cancer cells. Neoantigens used in vaccines and other types of immunotherapy are being studied in the treatment of many types of cancer." https://www.cancer.gov/publications/dictionaries/cancer-terms/def/neoantigen (National Cancer Institute Dictionary of Cancer Terms).

[8] A human leukocyte antigen is "[a] type of molecule found on the surface of most cells in the body. Human leukocyte antigens play an important part in the body's immune response to foreign substances. They make up a person's tissue type, which varies from person to person. Human leukocyte antigen tests are done before a donor stem cell or organ transplant, to find out if tissues match between the donor and the person receiving the transplant. Also called HLA and human lymphocyte antigen." https://www.cancer.gov/publications/dictionaries/cancer-terms/def/human-leukocyte-antigen (National Cancer Institute Dictionary of Cancer Terms).

[9] A T cell is "[a] type of white blood cell. T cells are part of the immune system and develop from stem cells in the bone marrow. They help protect the body from infection and may help fight cancer. Also called T lymphocyte and thymocyte." https://www.cancer.gov/publications/dictionaries/cancer-terms/def/t-cell (National Cancer Institute Dictionary of Cancer Terms).

[10] A neural network is a tool for deep learning inspired by the biology of our human brains, allowing computers to make connections with data and learn to improve from experience over time. Neural network architecture is the structure of a neural network, a map of the neural layers and processes." https://www.coursera.org/articles/neural-network-architecture

patient's routine tumor biopsy to predict which mutations would generate tumor-specific neoantigens most likely to be presented on the tumor cell surface by the HLA. Predicting the neoantigens is believed to be a critical step in creating individualized cancer vaccines. Gritstone's EDGE showed a significant improvement in accuracy for predicting neoantigens in comparison with publicly available approaches. Gritstone believes that mutations selected by the EDGE platform have a much higher likelihood of being useful targets for immunization than mutations selected using previous and/or publicly available methods.

Vaccines against viruses ideally generate both neutralizing antibody responses to whole proteins on the virus surface, and also T cell responses to the short fragments of viral proteins which are displayed on the surface of virus-infected cells (once inside a cell, a virus is invisible to antibodies which operate outside the cell). All viral proteins are foreign to the human immune system, but only short fragments of proteins (peptides) are displayed on the cell surface by HLA and visible to T cells. The specific fragments presented will vary between subjects depending upon the HLA type of the subject (conceptually similar to someone's blood type but more complex). Identification of key viral protein fragments that can be recognized and therefore potentially targeted by the immune system is an output of Gritstone's EDGE platform.

## 2.    Proprietary Vaccine Platform

The vaccine platform involves the ability to embed the antigen within the Company's proprietary delivery systems or vectors, which are designed to stimulate the immune system to attack and destroy diseased or infected cells by generating T cells and/or neutralizing antibodies ("nAbs"). Gritstone used these proprietary vectors, chimpanzee adenovirus ("ChAd") and self-amplifying mRNA ("samRNA"), independently and in combination across the Company's clinical programs.

## 3.    Oncology

By leveraging EDGE as well as its expertise in cancer genomics, Gritstone advanced cancer vaccines designed to direct a robust immune response to neoantigens, developing two key classes of tumor-specific neoantigen product candidates to treat patients with cancer including:

> a.    GRANITE, an investigational and individualized immunotherapy program; and
>
> b.    SLATE, an "off-the-shelf" immunotherapy program utilizing the same neoantigen identification capabilities and delivery system as GRANITE but containing a fixed set of neoantigens that are shared across a subset of cancer patients.

### a.    GRANITE

Many tumor mutations are unique to each individual patient. For patients with neoantigens arising from patient-specific mutations, Gritstone believed that an immunotherapy made specifically for each patient has the potential to drive a potent immune response. GRANITE, Gritstone's first oncology program, was the Company's investigational individualized immunotherapy program implemented through a personalized neoantigen-based vaccine.

10

For each patient, GRANITE starts with a routine clinical biopsy, which is then sequenced in-house and analyzed through the Company's proprietary EDGE™ platform to derive a set of predicted patient-specific neoantigens likely to be presented on the patient's tumor. Using these predicted neoantigens, the Company then designed and manufactured at its own biomanufacturing facility in Pleasanton, California, an individualized vaccine containing the relevant neoantigens to be administered by simple intramuscular injection. Gritstone's intent was to deliver the immunotherapy in a community oncology setting where a vast majority of cancer patients are treated.

Prepetition, GRANITE was being evaluated in a randomized Phase 2 study as a maintenance treatment in patients with newly diagnosed, metastatic microsatellite-stable colorectal cancer ("MSS-CRC") who have completed standard of care induction therapy. GRANITE was granted Fast Track designation by the U.S. Food and Drug Administration for the treatment of MSS-CRC. On April 1, 2024, Gritstone announced preliminary interim results from its ongoing randomized Phase 2 study which suggested that GRANITE could drive meaningful clinical benefits in front-line MSS-CRC, the second leading cause of cancer-related deaths.  On September 30, 2024, Gritstone announced further interim data from this trial.

### b.    SLATE

Some cancer mutations, known as driver mutations, are shared between cancer patients. Neoantigens that arise from these driver mutations may be able to be used alongside other common antigen types to develop a cancer vaccine that is available "off-the-shelf."  SLATE is Gritstone's investigational off-the-shelf immunotherapy program.

SLATE, the Company's second oncology program, utilized the same antigen identification capabilities and delivery system as GRANITE but contains a fixed set of cancer antigens that are shared across a subset of cancer patients (rather than neoantigens unique to an individual patient). A routine clinical biopsy can be used to identify patients that have common mutations within their tumor through commercially available genomic panel sequencing.

## D.    Infectious Disease

The CORAL program was initiated in 2020 in response to emerging limitations of first-generation COVID-19 vaccines, and served as proof-of-concept for Gritstone's ability to drive more potent and durable responses than those of current vaccines in prophylactic applications. As seen among COVID-19 and other infectious diseases, immune responses can vary and viruses mutate and neutralizing antibodies wane, necessitating re-dosing (boosters).

Across multiple Phase 1 trials within CORAL, early results demonstrated the potential ability of Gritstone's vaccines to elicit potent and durable neutralizing antibody responses, and potent cytotoxic cellular responses against key targets of the virus. These results have also provided early signals of the potential benefits of samRNA over first-generation mRNA vaccines such as those produced by Pfizer/BioNTech and Moderna.

## E.    Prepetition Financial Condition

The Company recorded revenues of $900,000 and $2.7 million for the three and six months

ended June 30, 2024, respectively, and $2 million and $4.4 million, respectively, for the same periods of the prior year.

As of the Petition Date, Gritstone's principal assets were its intellectual property portfolio and cash on hand. The Company had a portfolio of over 360 patent applications. The portfolio covers Gritstone's core technologies relating to its EDGE target selection platform, as well as its vector systems, including its proprietary ChAd and samRNA vectors and their methods of use. In addition, Gritstone has filed patent applications covering various specific immunogen/payload designs which include, for example, its off-the-shelf oncology payloads and infectious disease-specific payloads such as influenza, coronaviruses, and human papilloma virus. In addition to core technologies, Gritstone has additional patent applications covering other technologies including antigen binding proteins (*e.g.*, T cell receptors and bispecific antibodies) and CGMP manufacturing (*e.g.*, formulation improvements for ChAd and samRNA storage).

**F.     The Debtor's Capital Structure**

**1.     Secured Debt**

The Debtor, as borrower, Hercules Capital, Inc., as administrative and collateral agent (the "Prepetition Financing Agent"), and Hercules Capital, Inc., Hercules Capital Funding Trust 2022-1, and Silicon Valley Bank, a division of First-Citizens Bank & Trust Company (successor by purchase to the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bridge Bank, N.A.), as lenders (together with the Prepetition Agent, the "Prepetition Secured Parties"), are parties to a Loan and Security Agreement, dated as of July 19, 2022, as amended (along with any ancillary documents thereto, the "Prepetition Credit Agreement"), which provided the Company a 60-month term loan facility for up to $80 million in borrowing capacity across five potential tranches.

The Debtor has stipulated subject to the Challenge Rights in the DIP Financing Order that the obligations under the Prepetition Credit Agreement are secured by first priority liens on certain of the Debtor's assets, including, but not limited to, goods, accounts, equipment, inventory, investment property, general intangibles (other than intellectual property), cash, deposit accounts, and rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights, in, intellectual property, all as set forth in the Prepetition Credit Agreement.

As of the Petition Date, the outstanding principal obligations under the Prepetition Credit Agreement totaled approximately $40 million.

**2.     Unsecured Debt**

The Debtor scheduled approximately $14.6 million in General Unsecured Claims (primarily of trade creditors arising in the ordinary course of its business operations) subject to the notes set forth in the Schedules.

**3.     Equity Interests**

The Company's amended and restated certificate of incorporation authorizes the issuance of 300,000,000 shares of common stock and 10,000,000 shares of preferred stock. As of the

Petition Date, no shares of preferred stock were issued and outstanding.  As of September 30, 2024, there were 123,179,862 shares of common stock issued and outstanding.  As noted above, the Company completed its Initial Public Offering (IPO) in 2018 and is listed on the Nasdaq Global Select Market exchange under the ticker symbol GRTS.

## G.    **Events Leading to the Commencement of the Chapter 11 Case**

Like many clinical-stage biotechnology companies, Gritstone faced the inherent challenges of securing sufficient funding to support its ambitious research and development efforts. Specifically, biotech companies face significant financial pressures due to the high costs of clinical trials, regulatory hurdles, and the lengthy timelines required to bring new therapies to market. Moreover, recent global economic uncertainties, including inflationary pressures, supply chain disruptions, and geopolitical tensions, have further complicated the operational and financial environment for biotech firms. For example, interest rate hikes in response to post-COVID stimulus inflation drew a significant amount of capital away from certain cutting-edge industries, such as biotechnology. All of these factors led to increased scrutiny from investors, a tightening of available capital, and a need for companies to adopt more strategic approaches to resource allocation and operational efficiency.

The Company's focus on advancing its programs required substantial investment, and the volatility of the biotech sector, exacerbated by the COVID-19 pandemic, presented additional hurdles.  For example, in early 2024, Gritstone's collaboration with BARDA on its COVID-19 program faced delays due to regulatory and manufacturing challenges, which impacted the Company's financial outlook.  These challenges, combined with the delay in BARDA funding, led to a workforce reduction in February 2024, which reduced cash burn by approximately $4 million per quarter.

Despite careful financial management, the Company continued to experience pressures related to its operational costs, clinical trial expenditures, and the need for ongoing capital to advance its programs.  A recent April 2024 equity raise bolstered the Company's cash position, but additional capital would be required to support its clinical programs through to commercialization.

During the several weeks prior to the Petition Date, the Company: (i) retained the services of financial advisors to help develop strategies to manage its cash position and assess liquidity needs in the future; (ii) consulted with restructuring counsel in order to explore options to strengthen the Company's financial condition and operations; (iii) participated in a robust process led by its investment banker, Raymond James, to identify and evaluate strategic transactions and other financing options in the best interest of the Company and all of its stakeholders; (iv) negotiated with a party interested in exploring both out-of-court and Court-approved acquisition transaction models; and (v) engaged in extensive discussions with the Prepetition Agent in an effort to give the Company relief from liquidity constraints and provide sufficient capital to fund its operations while it pursued a potential transaction.

Unfortunately, the Company's discussions with the Prepetition Agent did not yield a workable solution and, in order to explore potential investment and other options for greater liquidity, the Company commenced its Chapter 11 Case.

H.    **Events During the Chapter 11 Case**

1.    **First Day and Other Early Relief**

In order to facilitate the Chapter 11 Case, minimize disruption to the Debtor's affairs, and preserve the value of the Estate, the Debtor filed motions with the Bankruptcy Court on or shortly after the Petition Date seeking certain relief, including[11]:

(a)    authority to honor and pay certain prepetition workforce compensation and expenses and other related obligations, subject to certain caps, which was granted on an interim basis pursuant to an interim order entered on October 16, 2024 [Docket No. 36] and on a final basis pursuant to an order entered on November 12, 2024 [Docket No. 158];

(b)    authority to continue operating its cash management system and honor certain related obligations, which was granted on an interim basis pursuant to an interim order entered on October 16, 2024 [Docket No. 37] and on a final basis pursuant to an order entered on November 12, 2024 [Docket No. 161];

(c)    authority to pay certain property, franchise and excise taxes and certain business fees, which was granted on an interim basis pursuant to an interim order entered on October 16, 2024 [Docket No. 40] and on a final basis pursuant to an order entered on November 12, 2024 [Docket No. 160];

(d)    authority to implement certain procedures and provide adequate assurance of payment to utility providers, which was granted on an interim basis pursuant to an interim order entered on October 16, 2024 [Docket No. 39] and on a final  basis pursuant to an order entered on November 12, 2024 [Docket No. 159];

(v)    authority to reject certain non-residential real property leases and abandon personal property at the leased premises [Docket No. 96], which was granted pursuant to an order entered on November 14, 2024 [Docket No. 182]; and

(e)    appointing Kurtzman Carson Consultants, LLC dba Verita Global as the claims and noticing agent in the Chapter 11 Case pursuant to an order entered on October 16, 2024 [Docket No. 38], and also as the Administrative Agent pursuant to an order entered on December 4, 2024 [Docket Nos. 168 and 21].

2.    **DIP Financing and Cash Collateral Relief**

Upon the Debtor's motion filed on October 14, 2024 [Docket No. 19], in light of the Debtor's immediate and critical need to use cash collateral, the Court authorized the Debtor's use of the cash collateral of the Prepetition Secured Parties and the granting of adequate protection to the Prepetition Secured Parties pursuant to sections 361, 362 and 363 of the Bankruptcy Code, including (a) additional and replacement liens on all assets of the Debtor (including the Debtor's Intellectual Property, as defined in the Prepetition Financing Documents); (b) superpriority

---

[11] Copies of all relevant pleadings are on file with the Bankruptcy Court and can be obtained free of charge by accessing the noticing/claims agent's website at https://veritaglobal.net/gritstone.

administrative claims under section 507(b), subject to the Carve-Out (as defined in the Cash Collateral Orders) and certain permitted prior liens; (c) the Debtor's payment, upon entry of the Interim Cash Collateral Order, of $4 million to the Prepetition Agent and, upon entry of the Final Cash Collateral Order, of an additional $2 million to the Prepetition Agent, to reduce the Prepetition Secured Obligations (as defined in the Cash Collateral Orders); and (d) the establishment of certain case milestones including November 21, 2024, as the deadline for approval of bid procedures for the sale of substantially all of the Debtor's assets and December 2, 2024, as the bid deadline (which has been extended). The Court, after an interim hearing, entered the Interim Cash Collateral Order on October 16, 2024 [Docket No. 35].

On October 30, 2024, the Debtor filed its motion (the "DIP Motion") [Docket No. 80] for approval of a senior secured, superpriority debtor in possession (DIP) financing facility in an aggregate principal amount of up to $25 million, from certain DIP Lenders and Future Solutions Investments LLC as administrative and collateral agent for the DIP Lenders, to provide additional liquidity to the end of January 2025 to pay administrative expenses, including ordinary and necessary operating expenses. Upon entry of the interim approval order, DIP facility proceeds were to be used to, among other things, repay $2.35 million of the outstanding Prepetition Secured Obligations (as defined in the DIP Motion) (to replace the Cash Collateral subject to the Prepetition Secured Liens (the "Prepetition Cash Collateral") used by the Debtor under the Interim Cash Collateral Order). Only the DIP Cash Collateral (i.e., loan proceeds) would be used for all other purposes set forth in the Approved Budget (as defined in the DIP Motion).

By the DIP Motion, the Debtor also sought to provide adequate protection to the Prepetition Secured Parties in that the Prepetition Cash Collateral will be solely used to return it to the Prepetition Secured Parties, and only the DIP Cash Collateral will be used for all other purposes set forth in the Approved Budget. As discussed in the DIP Motion, because the Prepetition Secured Parties did not consent to use of their cash collateral beyond the expiration date of the Interim Cash Collateral Order (i.e., November 13, 2024), the Debtor required the DIP financing to fund its proposed sale process and ensure the administrative solvency of the estate.

Following the Petition Date, the Debtor and the Debtor's advisors engaged in vigorous, arms-length negotiations with the DIP Lenders regarding the proposed terms of a DIP facility. The proposed DIP Financing was the best financing option that the Debtor could obtain under the circumstances. Alternative postpetition financing was not available to the Debtor absent the ability to prime the Prepetition Secured Parties. Other potential sources of debtor in possession financing for the Debtor, including on a junior secured basis, were also nonexistent. The Court entered an order on November 14, 2024 [Docket No. 180], approving the DIP facility.

### 3.    Debtor's Retention of Professionals and Personnel

The Debtor filed applications or motions, as applicable, to employ certain professionals, including Pachulski Stang Ziehl & Jones LLP as bankruptcy counsel in the Chapter 11 Case (approved by the Court pursuant to an order entered on November 12, 2024 [Docket No. 155]); Fenwick & West LLP as special corporate counsel to the Debtor [Docket Nos. 65 and 152]; Raymond James & Associates, Inc. as its investment banker [Docket Nos. 58 & 156]; Back Bay Management Corp. and its division, The Michel-Shaked Group, as expert consultants [Docket Nos. 60 & 153]; and PwC US Business Advisory LLP, as financial advisors [Docket Nos. 57 and 157].

4.       **Formation of the Committee**

On October 29, 2024, the U.S. Trustee formed the Committee, appointing BMR-Sidney Research Campus LLC, Presidio and Murigenics, Inc. as its members [Docket No. 77]. Pursuant to Court orders, the Committee has retained ArentFox Schiff LLP and Potter Anderson & Corroon LLP as its bankruptcy counsel [Docket Nos. 254 and 255], and FTI Consulting, Inc. as its financial advisor [Docket No. 256].

5.       **Postpetition Sales of Debtors' Assets**

On October 23, 2024, the Debtor filed its motion for, among other relief, approval of certain bid procedures for the sale of the Debtor's assets free and clear of liens and claims, certain bid protections in relation to any potential stalking horse agreements (including an up-to 3% breakup fee), and scheduling for an auction (the "Sale Motion") [Docket No. 67]. With the assistance of its investment banker, Raymond James & Associates, and in consultation with its major stakeholders, the Debtor conducted a robust marketing process to identify one or more parties interested in pursuing a sale or sales of the Debtor's assets.[12]  On November 14, 2024, the Bankruptcy Court entered an order approving certain bidding, auction and related procedures [Docket No. 181]; the bid deadline was December 4, 2024.  By the December 4, 2024 bid deadline, the Debtors received qualified bids from Hercules Capital, Inc. as agent; Tiger Capital Group, LLC and Liquidity Services, Inc.; Heritage Global Partners, Inc.; Seattle Project Corp.; Future Solution Investments, LLC; and NEC Bio, B.V. (*see* Docket No. 257). The auction occurred on December 9, 10, 11 and 12, 2024 (the "Auction").

SPC Sale: At the Auction, Seattle Project Corp. ("SPC") was chosen as the successful bidder for substantially all of the Debtor's assets excluding the Binder IP, the Hercules Assets, and certain other assets (the "SPC Assets"), based on SPC's final bid of $21.25 million (subject to the terms of the parties' Asset Purchase Agreement).  The sale (the "SPC Sale") of the SPC Assets to SPC was approved by the Court after a hearing held on December 20 (the "Sale Hearing"), pursuant to an order entered on December 23, 2024 [Docket No. 293].  The SPC Assets constitute DIP Senior Collateral (as defined in the DIP Orders) and the DIP Lenders' liens have attached to the proceeds (both cash and non-cash) attributable to the SPC Assets pursuant to the SPC Sale (deposited into the Segregated Account (as defined in the DIP Orders)).  The sale of the SPC Asset closed on December 30, 2024.

Hercules Sale: Also at the Auction, Hercules Capital, Inc., as agent ("Hercules") was chosen by the Debtors as the successful bidder for the Debtors' machinery and equipment (the "Hercules Assets") in the form of a credit bid in the amount of $3 million. After the Sale Hearing, the sale of the Hercules Assets (the "Hercules Sale") to Hercules was approved by the Court pursuant to an order entered on December 20, 2024 [Docket No. 288].  The sale of the Hercules Assets closed on December 27, 2024.

FSI Sale: Finally, at the Auction, the Debtor designated Future Solutions Investments, LLC ("FSI"), the DIP Agent (on behalf of itself and the DIP Lenders), as the successful bidder for

---

[12] The Debtor's sale process was managed by Raymond James, which was retained by the Debtor in August 20, 2024. Raymond James identified and contacted approximately 266 potential buyers, both industry and financial players. *See Declaration of Geoffrey Richards* [Docket No. 267].

certain of the Debtor's intellectual property (the "Binder IP"), in the form of a credit bid in the amount of $1.5 million.  The Court entered an order on December 20, 2024 approving the selection of the successful bid subject to confirmation and consummation of the Plan [Docket No. 286].

### 6.     Schedules and Statement of Financial Affairs

The Debtor filed its Schedules of Assets and Liabilities [Docket No. 193] and Statement of Financial Affairs [Docket No. 194].  In the Schedules, the Debtor scheduled approximately $14.6 million in general unsecured claims (Schedule F), subject to the notes therein.

### 7.     Debtor's KEIP and KERP

Upon the Debtor's motion (the "KEIP/KERP Motion") [Docket No. 59], the Court approved the Debtor's proposed key employee incentive program (KEIP) for six Senior Leadership Employees and proposed key employee retention program (KERP) for 24 Non-Insider Employees (as defined in the KEIP/KERP Motion). Prior to the Petition Date, the Debtor reduced its workforce by approximately 40% on or about February 29, 2024. As a result of the reductions in force, many of the remaining employees in the Debtor's clinical, accounting, finance, legal, human resources, and operations departments had substantial additional responsibilities as they worked toward a restructuring of the business.

The respective KEIP Awards were to be payable upon the closing of a sale resulting in the successful transfer of substantially all of the Debtor's assets pursuant to section 363 or 1129 of the Bankruptcy Code (the "Trigger Date"). The respective KEIP Awards were to be based upon the aggregate gross sale proceeds received from the disposition of assets, plus the amount of any assumed liabilities. While the full KEIP Award will be fully earned upon the Trigger Date, 75% of each KEIP Award will be paid upon the closing of a sale and the remaining 25% of each KEIP Award will be paid upon the effective date of a plan.  The KEIP award totals in the range of $0 - $4,519,000, depending upon the sale proceeds received. Regarding the KERP, the 24 Non-Insider Employees, who each serve crucial roles in the Debtor's various clinical, technical, operational, and back office and administrative positions, would receive a payment of one month base salary, in a single installment. The KERP has a maximum cost of approximately $569,522 in the aggregate.

The KEIP and KERP were approved by the Court pursuant to an order entered on November 13, 2024 [Docket No. 148].  [The sales (as described above) did not yield sufficient proceeds to trigger the payments under the KEIP].

### 8.     Worthless Stock Notice Procedures

Upon the Debtor's motion (the "Stock Procedures Motion") [Docket No. 66], the Court approved certain procedures related to the transfers of beneficial ownership or, and declarations of worthlessness with respect to, the Debtor's common stock, directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to, beneficial ownership of the common stock in violation of the procedures will be null and void, and granting related relief. The Court's order granting the Stock Procedures Motion was entered on November 13, 2024 [Docket No. 151]. The relief granted by the Court pursuant to the Stock Procedures Motion was designed to preserve the value of the Tax Attributes for the benefit of the Debtor's stakeholders.

## III.
## SUMMARY OF THE PLAN

**A.    General**

The Plan is a plan of reorganization pursuant to which the Debtor will emerge from bankruptcy and continue to operate its business as the Reorganized Debtor on and after the Effective Date.  As of the Effective Date, the Reorganized Debtor will have a restructured balance sheet through a debt-to-equity conversion, and a Liquidating Trust with certain assets will be established for the benefit of general unsecured creditors, as more fully set forth below.

**B.    Treatment of Unclassified Claims**

Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code.  As such, the Debtor has not placed the following Claims in a Class:

**Administrative Expense Bar Date.**  All Other Administrative Expense Claims that are not subject to payment in the ordinary course of the Debtor's business must be Filed with the Bankruptcy Court not later than the "Administrative Bar Date" as defined and set forth in the Administrative Bar Date Order, or, if the Administrative Bar Date does not apply to such Other Administrative Expense Claim, then ten (10) days before the date scheduled for the Confirmation Hearing (such applicable date, the "<u>Administrative Expense Bar Date</u>"), and objections (if any) to such Other Administrative Expense Claims may be Filed no later than forty-five (45) days after the Effective Date.  Any Holder of an Other Administrative Expense Claim who fails to file a timely request for the payment of an Other Administrative Expense Claim as provided in this paragraph: (i) shall be forever barred, estopped and enjoined from asserting such Other Administrative Expense Claim against the Debtor, the Reorganized Debtor or the Liquidating Trust Assets (or filing a request for the allowance thereof), and the Debtor, the Estate, the Reorganized Debtor and all of its property, and the Liquidating Trust Assets shall be forever discharged from any and all indebtedness or liability with respect to such Other Administrative Expense Claim; and (ii) such Holder shall not be permitted to participate in any distribution under the Plan on account of such Other Administrative Expense Claim.

For the avoidance of doubt, Persons or Entities seeking awards by the Bankruptcy Court for Professional Fee Claims shall not be required to comply with the Administrative Expense Bar Date; instead, Professional Fee Claims are governed by section II.A.4 of the Plan and the Professional Fee Claim Bar Date.

**DIP Financing Claims.**  Each Holder of an Allowed DIP Financing Claim shall, in full and final satisfaction of such Allowed DIP Financing Claim, (i) receive Cash in an amount equal to $16,725,000 on a Pro Rata basis and (ii) convert the balance of such claim into the New Equity Interests on a Pro Rata basis.  Following such payments and conversion, any and all commitments under the DIP Facility Agreement shall be cancelled and discharged without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the

18

vote, consent, authorization or approval of any Person or Entity. Notwithstanding anything herein to the contrary, the Liens and security interests securing the DIP Financing Claims shall continue in full force and effect until such time as the Allowed DIP Financing Claims have been fully satisfied as set forth above.

**Other Administrative Expense Claims**. Each Holder of an Allowed Other Administrative Expense Claim shall, in full and final satisfaction of such Allowed Other Administrative Expense Claim, be paid either (i) in Cash, in full, on, or as soon as practicable following, the latest of (x) the Effective Date, (y) the date such Claim becomes due and payable in the ordinary course of business, and (z) the date of entry of a Final Order allowing such Other Administrative Expense Claim, or (ii) on such other terms and conditions as may be agreed between the Holder of such Claim, on the one hand, and the Debtor, Reorganized Debtor or the Liquidating Trustee (as the case may be), on the other hand.

**Professional Fee Claims**.  Notwithstanding anything herein to the contrary, all Persons or Entities seeking awards by the Bankruptcy Court of Professional Fee Claims for compensation for services rendered or reimbursement of expenses incurred on behalf of the Estate prior to the Effective Date shall file, on or before the date that is thirty (30) days after the Effective Date (the "Professional Fee Claim Bar Date"), their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred. The Debtor, Reorganized Debtor or Liquidating Trustee, as applicable, shall pay each Professional Fee Claim within fifteen (15) days after such claim becomes an Allowed Claim.

The Debtor, Reorganized Debtor and Liquidating Trustee, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date by their respective Professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

**Priority Tax Claims**.  Each Holder of an Allowed Priority Tax Claim, shall, in full and final satisfaction of such Allowed Claim receive quarterly payments of principal and interest over a five (5) year period from the Petition Date, with interest accruing the statutory rate, or such other rate as determined by the Bankruptcy Court absent an agreement between the Debtor and the Holder of an Allowed Priority Tax Claim or as otherwise permitted pursuant to Bankruptcy Code section 1129(a)(9)(C).  Payments to Holders of Allowed Priority Tax Claims shall commence on the later of (i) thirty (30) days following the end of the first calendar month after the Effective Date, and (ii) the first Business Day in the calendar month after such Claims become Allowed Claims.

## C.    **Classification and Treatment of Claims and Equity Interests**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.    Class 1 – Prepetition Secured Claims

- *Classification*:  Class 1 comprises the Allowed Prepetition Secured Claims.

19

- *Treatment*:  The Prepetition Agent, on account of each Holder of an Allowed Class 1 Claim, shall receive, in full and final satisfaction of such Allowed Claim, Cash in an amount equal to $400,000; *provided that* Class 1 votes to accept the Plan and no Holder of Class 1 Claims objects to the Plan, Plan-related documents or otherwise contests confirmation of the Plan.  The remaining balance of the Prepetition Secured Claims, after the application of foregoing, constitutes the Prepetition Lenders' Deficiency Claim and shall be treated as an Allowed Class 5 General Unsecured Claim in accordance with 11 U.S.C. § 506(a). The Allowed amount of such Prepetition Lenders' Deficiency Claim is $17,453,000.

- *Voting*:  Class 1 is Impaired and the Prepetition Agent, on account of the Holders of Class 1 Claims, is entitled to vote on the Plan.

2.    Class 2 – Other Secured Claims

- *Classification*:  Class 2 comprises the Allowed Other Secured Claims.

- *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim on or as soon as practicable following the Effective Date, at the sole discretion of the Debtor, or Reorganized Debtor, as applicable:  (i) Cash equal to the Allowed amount of such Other Secured Claim; (ii) receipt of any Collateral securing such Claim; (iii) treatment that leaves unaltered the legal, equitable and contractual rights to which such Allowed Other Secured Claim entitles the Holder of such Claim; or (iv) such other treatment as may be agreed upon with the Holder of such Allowed Other Secured Claim, on the one hand, and the Debtor or the Reorganized Debtor, as applicable, on the other hand.  On the full payment or other satisfaction of the obligations set forth in this paragraph, the Liens securing the Allowed Other Secured Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person or Entity.

- *Voting*:  Class 2 is Unimpaired and the Holders of Class 2 Claims are deemed to have accepted the Plan.

3.    Class 3 – Secured Tax Claims

- *Classification*:  Class 3 comprises the Allowed Secured Tax Claims.

- *Treatment*:  Each Holder of an Allowed Class 3 Claim shall, in full and final satisfaction of such Allowed Claim, receive quarterly payments of principal and interest over a five (5) year period from the Petition Date, with interest

accruing at the statutory rate of interest, or as otherwise permitted pursuant to Bankruptcy Code Section 1129(a)(9)(C), or as otherwise agreed; provided that the Reorganized Debtor, in its sole discretion, may prepay such Allowed Claim in full at any time.  Payments to Class 3 shall commence on the later of (i) thirty (30) days following the end of the first calendar month after the Effective Date, and (ii) the first Business Day in the calendar month after such Claim becomes an Allowed Claim.  The Holder of a Class 3 Claim shall retain its Lien in the same property owned by the Reorganized Debtor solely and to the same extent it held such Liens in the Debtor's assets.  Upon full and complete payment of each Allowed Class 3 Claim, such Holder's liens and security interests shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person or Entity.

- *Default:*  In the event of any failure of the Reorganized Debtor to timely make its required plan payments to the Holder of an Allowed Class 3 Claim, or any failure to pay post-petition ad valorem property taxes owed prior to delinquency, either of which shall constitute an event of default under the Plan, the Holder of such Allowed Class 3 Claim shall send written notice of such default to the Reorganized Debtor.  If the default is not cured within twenty (20) days of the date of such notice, the Class 3 Claimant may proceed to collect all amounts owed pursuant to state law without further recourse to the Bankruptcy Court.  Any Holder of an Allowed Class 3 Claim is only required to send two (2) notices of default, and upon the third event of default, such creditor may proceed to collect all amounts owed under state law without recourse to the Bankruptcy Court and without further notice.

- *Voting*:  Class 3 is Impaired and the Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

4.      Class 4 – Priority Non-Tax Claims

- *Classification*:  Class 4 comprises the Allowed Priority Non-Tax Claims.

- *Treatment*:  To the extent it has not already been satisfied pursuant to prior Bankruptcy Court order, each Holder of an Allowed Class 4 Claim shall, in full and final satisfaction of such Allowed Claim, receive deferred Cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claim, or as otherwise permitted pursuant to Bankruptcy Code Section 1129(a)(9)(B), such payments to commence on the later of fifteen (15) days following (i) the Effective Date or (ii) after such Claim becomes an Allowed Claim, unless the Debtor or Reorganized Debtor and the Holder of a Class 4 Claim otherwise agree.

4897-3798-2723.22 32903.00002

- *Voting*:  Class 4 is Impaired and the Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

5.      Class 5 – General Unsecured Claims

- *Classification*:  Class 5 comprises the Allowed General Unsecured Claims; for the avoidance of doubt, the Prepetition Lenders' Deficiency Claim is a General Unsecured Claim.

- *Treatment*:  Each Holder of an Allowed Class 5 Claim shall receive, in full and final satisfaction of such Allowed Claim subject to the Holder's timely election to receive Convenience Claim treatment in Class 6 on account of the Allowed Unsecured Claim in accordance with the procedures set forth in the Disclosure Statement Order, 100% of the Liquidating Trust Interests on a Pro Rata basis.  The allowance and distributions from the Liquidating Trust will be determined by the Liquidating Trustee, as otherwise governed by the Plan and the Liquidating Trust Agreement.

- *Voting*:  Class 5 is Impaired and the Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

6.      Class 6 – Convenience Claims

- *Classification*:  Class 6 comprises the Allowed Convenience Claims.

- *Treatment*:  Each Holder of an Allowed Class 6 Claim shall receive, in full and final satisfaction of such Allowed Claim, up to 20% of the Allowed amount of such Claim (capped at the Pro Rata share of the Convenience Claims Cap), in Cash on the later of fifteen (15) days following (i) the Effective Date or (ii) the date such Claim becomes an Allowed Claim, unless the Debtor or Reorganized Debtor and the Holder of a Class 6 Claim otherwise agree; *provided, however*, that the aggregate amount that may be distributed on account of all Allowed Convenience Claims shall not exceed the Convenience Claims Cap.

- *Voting*:  Class 6 is Impaired and the Holders of Claims in Class 6 are entitled to vote to accept or reject the Plan.

7.      Class 7 – Subordinated Claims

- *Classification*:  Class 7 comprises the Allowed Subordinated Claims.

- *Treatment*:  On and after the Effective Date, in accordance with Bankruptcy Code Section 510, any Subordinated Claim shall be automatically subordinated and receive no distribution on account of any such Claim without further notice, order of the Bankruptcy Court, act or action under

applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person or Entity.

- *Voting*: Class 7 is Impaired and pursuant to Bankruptcy Code Section 1126(g) is deemed to have rejected the Plan.  Therefore, votes from Holders in Class 7 will not be solicited.

8.      Class 8 – Equity Interests

- *Classification*:  Class 8 comprises the Equity Interests.

- *Treatment*:  As of the Effective Date, any and all Equity Interests are cancelled and deemed discharged without any further notice or order.  No distributions shall be made under the Plan on account of any Equity Interest.

- *Voting*:  Class 8 is Impaired and pursuant to Bankruptcy Code Section 1126(g) is deemed to have rejected the Plan.  Therefore, votes from Holders in Class 8 will not be solicited.

**D.      <u>Provisions for Implementation of Plan</u>**

**1.      Reorganization of the Debtor**

The Plan contemplates the reorganization of the Debtor with it emerging from bankruptcy and continuing to operate its business as the Reorganized Debtor with a completely restructured balance sheet.  All of the property of the Estate and of the Debtor, including the Retained IP, shall vest automatically in the Reorganized Debtor free and clear of any and all Claims, Liens and Equity Interests, except for those Claims and Liens expressly provided for in the Plan pursuant to Bankruptcy Code sections 1141(b) and (c), without the need for any further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person or Entity, except for any asset that is expressly excluded or disclaimed and the Liquidating Trust Assets. For the avoidance of doubt, the Reorganized Debtor shall not assume and will have no liability for any claim for indemnity, contribution, advancement or reimbursement asserted by or on behalf of any officer or director who served in such role prior to the Effective Date.

**2.      Liquidating Trust**

**a.      Establishment of Liquidating Trust**

On the Effective Date, the Debtor and the Liquidating Trustee, on their own behalf and on behalf of Holders of Allowed Claims in Classes 5 and 6, shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries in accordance with the Plan.  The Liquidating Trust will issue a single class of Liquidating Trust Interests.

**b.      Funding of Liquidating Trust**

23

The Liquidating Trust will be irrevocably vested with the (i) Trust Funding Amount, (ii) Vested Causes of Action, and proceeds thereof and (iii) Trust Initial Distribution.

### c.      Appointment of Liquidating Trustee

The Liquidating Trustee shall be acceptable to the Committee, in its sole discretion, after consultation with the Debtor and the Prepetition Agent, and approved by the Bankruptcy Court in the Confirmation Order.

### d.      Transfer and Vesting of Liquidating Trust Assets in Liquidating Trust

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidating Trust Assets become available, the Debtor shall be deemed to have automatically transferred to and vested in the Liquidating Trust all of its right, title and interest in and to all of such additional Liquidating Trust Assets, and in accordance with sections 1123 and 1141 of the Bankruptcy Code, all such assets shall automatically irrevocably vest in the Liquidating Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the applicable Liquidating Trust Beneficiaries, as set forth in the Plan, and the reasonable fees and expenses of administering the Liquidating Trust, including the reasonable fees and expenses of the Liquidating Trustee, as provided in the Liquidating Trust Agreement. Thereupon, the Debtor shall have no interest in or with respect to such additional Liquidating Trust Assets or the Liquidating Trust, except to the extent that the Reorganized Debtor has or acquires an Allowed Claim against the Liquidating Trust (whether through purchase, assignment, subrogation or otherwise). For the avoidance of doubt, the Liquidating Trust shall not be vested with any of the Excluded Actions.

### e.      Preservation of Confidences and Attorney-Client Privilege

To effectively investigate, defend or pursue the Liquidating Trust Assets, including the Vested Causes of Action, the Debtor, the Reorganized Debtor, the Liquidating Trust, Liquidating Trustee and all counsel thereto, must be able to exchange information with each other on a confidential basis and cooperate in common interest efforts without waiving any applicable privilege. Given the common interests of the parties and the Liquidating Trust's position as successor to the Liquidating Trust Assets, sharing such information in the manner described in the previous sentence to the extent necessary, shall not waive or limit any applicable privilege or exemption from disclosure or discovery related to such information. Furthermore, the Debtor and the Reorganized Debtor, as applicable, shall fully and timely cooperate with all reasonable requests for documents and/or information from the Liquidating Trustee in connection with the Liquidating Trustee's execution of its duties pursuant to the Plan and the Liquidating Trust Agreement. For purposes of such cooperation, the Liquidating Trustee and the Debtor and/or Reorganized Debtor, as applicable, may enter into one or more confidentiality and/or common interest agreements or protective orders in form and substance reasonably acceptable to the Liquidating Trustee and Reorganized Debtor. Until the termination of the Liquidating Trust, the Reorganized Debtor shall be bound by and adhere to all legal hold and similar obligations of the Debtor, its agents, and advisors, and shall not transfer or destroy, *without limitation*, any communications, documents and/or information referring or relating to (i) the Granville Derivation Action, (ii) the Rodriguez

Class Action (iii) the Board meeting minutes, Board agendas, notes and presentations, and/or (iv) any other Vested Causes of Action or other Liquidating Trust Assets. Any dispute with respect to the Debtor and/or the Reorganized Debtor's cooperation under this paragraph may be brought before and decided by the Bankruptcy Court. The Liquidating Trustee shall not waive any applicable privilege without the express written consent of the Reorganized Debtor and any purported waiver not in compliance with the foregoing shall be ineffective.

###### f. Treatment of Liquidating Trust for Federal Income Tax Purposes; No Successor-in-Interest

The Liquidating Trust shall be established for the primary purpose of liquidating its assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee shall in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, including the Vested Causes of Action, make timely distributions of the proceeds therefrom to the Liquidating Trust Beneficiaries, as the case may be, and not unduly prolong their duration. The Liquidating Trust shall not be deemed a successor in interest of the Debtor for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust. For all federal income tax purposes, all parties (including the Debtor, the Reorganized Debtor, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets by the Debtor to the Liquidating Trust, as set forth in the Liquidating Trust Agreement, as a transfer of such assets by the Debtor to the Liquidating Trust Beneficiaries entitled to distributions from the Liquidating Trust Assets, followed by a transfer by such beneficiaries to the Liquidating Trust. Thus, the Liquidating Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

As soon as practicable after the Effective Date, the Liquidating Trustee (to the extent that he or she deems it necessary or appropriate in his or her sole discretion) shall value the Liquidating Trust Assets in the Liquidating Trust, based on the good faith determination of the Liquidating Trust, and shall apprise the Liquidating Trust Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including the Debtor, the Reorganized Debtor, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidating Trust Assets.

The right and power of the Liquidating Trustee to invest the Liquidating Trust Assets transferred to the Liquidating Trust, the proceeds thereof, or any income earned by the Liquidating Trust, shall be limited to the right and power to (i) invest the Liquidating Trust Assets (pending distributions in accordance with the Plan) in (a) short-term direct obligations of, or obligations guaranteed by, the United States of America, (b) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof or (c) such other investments as the Bankruptcy Court may approve from time to time; or (ii) deposit such assets in demand deposits or certificates of deposit at any bank or trust company, which has, at the time of the deposit, a

capital stock and surplus aggregating at least $1,000,000,000 (collectively, the "Permissible Investments"); *provided*, *however*, that the scope of any such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

Subject to the provisions of this Article, the Liquidating Trustee shall distribute to the Liquidating Trust Beneficiaries all net Cash income plus all net Cash proceeds from the liquidation of the Liquidating Trust Assets (including as Cash for this purpose, all Cash equivalents) at such time intervals as decided by the Liquidating Trustee in his or her discretion, pursuant to the terms of the Plan. The Liquidating Trust shall make distributions no less frequently than once per twelve-month period, such period to be measured from the Effective Date; *provided*, *however*, that the Liquidating Trustee may, in his or her sole discretion, cause the Liquidating Trust to retain an amount of net Cash proceeds or net Cash income reasonably necessary to maintain the value of its assets or to meet Claims and contingent liabilities (including Disputed Claims). The Liquidating Trustee may also determine that in a given period or on the anniversary of the Effective Date, there are insufficient assets to make a distribution.

The Liquidating Trustee shall require any Liquidating Trust Beneficiary or other party receiving a distribution to furnish to the Liquidating Trustee in writing his, hers or its Employer or Taxpayer Identification Number as assigned by the IRS and the Liquidating Trustee may condition any distribution to any Liquidating Trust Beneficiary or other party receiving a distribution upon receipt of such identification number.

### g.    Liquidating Trustee's Authority and Duties

From and after the Effective Date, the Liquidating Trustee shall serve as trustee of the Liquidating Trust and shall have all powers, rights and duties of a trustee, as set forth in the Liquidating Trust Agreement. Among other things, the Liquidating Trustee shall:  (i) hold and administer the Liquidating Trust Assets, (ii) have the sole authority and discretion on behalf of the Liquidating Trust to evaluate and determine strategy with respect to the Liquidating Trust Assets, and to litigate, settle, transfer, release or abandon and/or compromise in any manner any and all such Liquidating Trust Assets on behalf of the Liquidating Trust on any terms and conditions as it may determine in good faith based on the best interests of the Liquidating Trust Beneficiaries, (iii) have the power and authority to retain, as an expense of the Liquidating Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Liquidating Trustee hereunder or in the Liquidating Trust Agreement, (iv) make distributions to the Liquidating Trust Beneficiaries as provided in the Liquidating Trust Agreement and the Plan, (v) have the right to receive reasonable compensation for performing services as the Liquidating Trustee and to pay the reasonable fees, costs and expenses of any counsel, professionals, advisors or employees as may be necessary to assist the Liquidating Trustee in performing the duties and responsibilities required under the Plan and the Liquidating Trust Agreement, (vi) file, litigate, settle, compromise or withdraw objections to Claims as set forth in Section VIII.A herein, (vii) be considered an estate representative under Section 1123 of the Bankruptcy Code with respect to the Liquidating Trust Assets and (viii) have the right to provide periodic reports and updates to its Liquidating Trust Beneficiaries regarding the status of the

administration of the Liquidating Trust Assets, including the Vested Causes of Action, and the assets, liabilities and transfers of the Liquidating Trust. For the avoidance of doubt, the Liquidating Trust shall not be funded with, and the Liquidating Trustee shall not have any authority, powers, or duties with respect to any of the Excluded Actions. The Liquidating Trust and the Liquidating Trustee shall have no obligation to file any tax returns for the Debtor or Reorganized Debtor.

### h.    Termination of Liquidating Trust

The Liquidating Trust will terminate as soon as practicable, but in no event later than the fifth (5th) anniversary of the Effective Date; _provided_, _however_, that, on or prior to the date of such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidating Trust for a finite period, if such an extension is necessary to liquidate such Liquidating Trust Assets or for other good cause. Notwithstanding the foregoing, multiple extensions may be obtained so long as Bankruptcy Court approval is obtained prior to the expiration of each extended term; _provided further, however_, that the Liquidating Trustee receives an opinion of counsel or a favorable ruling from the IRS that any further extension would not adversely affect the status of the Liquidating Trust as a grantor trust for federal income tax purposes.

### i.    Termination of Liquidating Trustee

The duties, responsibilities and powers of the Liquidating Trustee shall terminate in accordance with the terms of the Liquidating Trust Agreement.

### j.    Exculpation; Indemnification

The Liquidating Trustee, and its professionals, shall be exculpated and indemnified pursuant to and in accordance with the terms of the Liquidating Trust Agreement.

### k.    Preservation of Records and Documents

The Debtor, the Reorganized Debtor, and the Liquidating Trustee, as applicable, shall: (i) take commercially reasonable efforts to preserve all records and documents (including any electronic records or documents) related to the Liquidating Trust Assets (including the Vested Causes of Action) for a period of five (5) years from the Effective Date or, if actions with respect to any applicable Vested Causes of Action are then pending, until the Liquidating Trustee notifies the Liquidating Trust Beneficiaries such records are no longer required to be preserved; and (ii) provide the Liquidating Trust, the Liquidating Trust Beneficiaries and their respective counsel, agents and advisors, with reasonable access to and the ability to make copies of such records and documents including at a reasonable time and location.

### l.    Discovery

The Liquidating Trust shall be authorized to employ Bankruptcy Rule 2004 and any other bankruptcy tools of discovery available to the Estate until the Chapter 11 Case is closed.

### 3.    Appointment of Officers and Directors of the Reorganized Debtor

Upon the Effective Date, (a) the existing board of directors of the Debtor and any remaining officer of the Debtor shall be deemed to have resigned and (b) the Holder(s) of the New Equity Interests exercising their authority to appoint new directors and officers of the Reorganized Debtor shall be deemed to have appointed the new directors and officers of the Reorganized Debtor identified in the Plan Supplement, to the extent known at the time of filing, or otherwise set forth in a written consent of the Holder(s) of the New Equity Interests. The Reorganized Debtor or the Holder(s) of the New Equity Interests, as applicable, are authorized to make any changes or modifications to its existing by-laws or corporate governance documents to effectuate such change, without any further notice to or approval by the Bankruptcy Court.

## 4.    Binding Effect

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan shall bind all Holders of Claims and Equity Interests.

## 5.    Cancellation of Notes, Instruments, Debentures and Equity Securities

On the Effective Date, except to the extent provided otherwise in the Plan, any agreement, note, instrument, certificate or other document evidencing or creating any Claim against or Equity Interest in the Debtor shall be automatically cancelled and terminated and of no further force and effect as respects the Debtor, without any further act or action and deemed surrendered without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtor (but not of any third party) under the agreements, notes, instruments, certificates or other documents governing such Claims and Equity Interests shall be discharged.

## E.    Executory Contracts and Unexpired Leases

## 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Any executory contract or unexpired lease that has not expired by its own terms on or prior to the Effective Date and that (a) the Debtor has not assumed and/or assigned or rejected with the approval of the Bankruptcy Court prior to the Effective Date, (b) is not the subject of a motion to assume the same pending as of the Effective Date, or (c) is not identified in the Schedule of Assumed Agreements, shall be deemed rejected by the Debtor, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to sections 365(a) and 1123 of the Bankruptcy Code. The executory contracts and unexpired lease identified in the Schedule of Assumed Agreements shall be assumed as set forth herein and the Plan Supplement as of the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the executory contracts or unexpired leases as set forth in the Plan or the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth in the Plan, or in the Plan Supplement, assumptions or rejections of executory contracts and unexpired leases pursuant to the Plan are effective as of the Effective Date. Each executory contract or unexpired lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, including in accordance with any amendments executed by the Debtor and the

counterparties to the applicable executory contract or unexpired lease during this Chapter 11 Case and effective upon assumption by the Debtor; *provided* that, prior to the to the Effective Date and in connection with such assumption, any such terms that are rendered unenforceable by the provisions of the Plan or the Bankruptcy Code shall remain unenforceable solely in connection therewith.

The Debtor reserves the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date, (a) to delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (b) to add any executory contract or unexpired lease and provide for its assumption and assignment under the Plan. The Debtor will provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to those agreements affected by the amendment.

Notwithstanding anything to the contrary in the Plan, as of the Effective Date, all rights of the Debtor, its directors, officers and executives, and the Estate in any D&O Liability Insurance Policies are fully and expressly preserved under the Plan.  Confirmation and effectiveness of the Plan will not discharge or impair, or otherwise modify any rights of the Debtor, Reorganized Debtor, its directors, officers and executives, the Estate, the Liquidation Trustee, or any other beneficiary under the D&O Liability Insurance Policies.  For the avoidance of doubt, the Debtor, Reorganized Debtor, its directors, officers and executives, and the Estate reserve all rights, claims, offsets, setoffs, defenses, counterclaims and all other interests relating to any and all D&O Liability Insurance Policies.  With the exception of the current D&O Liability Insurance Policies in effect, all other D&O Liability Insurance Policies are treated as non-executory contracts that are neither assumed nor rejected under the Plan.

## 2.     Rejection Claims; Cure of Defaults

If the rejection of an executory contract or unexpired lease results in damages to the counterparty or counterparties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a Proof of Claim that has been timely Filed, shall be forever barred and shall not be enforceable against the Debtor or the Liquidating Trust, as applicable, or their properties, successors or assigns, unless a Proof of Claim is timely Filed with the Voting Agent and served upon the Debtor and the Liquidating Trustee and their respective counsel on or before (x) thirty (30) days after the later to occur of (i) the Effective Date and (ii) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or unexpired lease, or (y) such other date as may be ordered by the Bankruptcy Court.

Any amount that must be paid under Bankruptcy Code section 365(b)(1) to cure a default under and compensate the non-debtor party to an executory contract or unexpired lease to be assumed under the Plan is identified as the "Cure Payment" on the Schedule of Assumed Agreements.  Unless the parties mutually agree to a different date, such payment shall be made in Cash within ten (10) Business Days following the last of: (a) the Effective Date, (b) entry of a Final Order resolving any disputes regarding (i) the amount of any Cure Payment, (ii) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365 with respect to a contract or lease to be assumed, to the extent required, or (iii) any other matter pertaining to assumption and assignment, and (c) the date

4897-3798-2723.22 32903.00002

on which such payment would otherwise be due in the ordinary course of business in accordance with the terms and conditions of the applicable executory contract or unexpired lease.

Pending the Bankruptcy Court's ruling on any such dispute, the executory contract or unexpired lease at issue shall be deemed assumed by the Debtor and vested in the Reorganized Debtor, unless otherwise agreed by the parties or ordered by the Bankruptcy Court. Any Person that is a party to an executory contract or unexpired lease that will be assumed and/or assigned under the Plan and that objects to such assumption or assignment (including the proposed Cure Payment) must file with the Bankruptcy Court and serve on parties entitled to notice a written statement and, if applicable, a supporting declaration stating the basis for its objection. This statement and, if applicable, declaration must be Filed and served on or before the deadline established by the Disclosure Statement Order. Any Person that fails to timely file and serve such a statement and, if applicable, a declaration shall be deemed to waive any and all objections to the proposed assumption and assignment (including the proposed Cure Payment) of its contract or lease. In the absence of a timely objection by a person that is a party to an executory contract or unexpired lease, the Confirmation Order shall constitute a conclusive determination regarding the amount of any cure and compensation due under the applicable executory contract or unexpired lease, as well as a conclusive finding that the Reorganized Debtor has demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease, to the extent required.

## F.    Provisions Governing Distributions

### 1.    Time and Method of Distributions

Any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon as practicable thereafter, unless otherwise specifically provided for by the Plan. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Liquidating Trust Distributions. The Liquidating Trustee, on behalf of the Liquidating Trust, or such other Person or Entity as may be designated in accordance with the Liquidating Trust Agreement, will make the distributions to Liquidating Trust Beneficiaries required under the Plan in accordance with the Liquidating Trust Agreement and in accordance with the priorities set forth herein and the other provisions of the Plan, and administer and liquidate any assets in the Liquidating Trust and otherwise wind down the Estate, including the following:  (a) general administration costs (*e.g.*, trustee/trust fees, etc.), (b) access to and review of information for any and all potential Claims, (c) access to and review of information for any and all Vested Causes of Action, (d) analysis and assessment related to Claims objection/resolution, (e) analysis and assessment related to Vested Causes of Action, (f) preparation of Claims objections and entering into/resolutions thereof, (g) preparation of Vested Causes of Action (excluding the actual prosecution thereof), (h) distribution of proceeds (*e.g.*, claims agent, *etc.*), and (i) liquidation or abandonment of certain Liquidating Trust Assets. Whenever any distribution to be made under the Plan or the Liquidating Trust Agreement is due on a day other than a Business Day, such distribution shall be made, without interest, on the immediately succeeding Business Day, but any

such distribution will have been deemed to have been made on the date due.

## 2.    Reserve for Disputed Claims

The Debtor, the Reorganized Debtor, or Liquidating Trustee, as applicable, may maintain a reserve for any distributable amounts required to be set aside on account of Disputed Claims and shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein and in the Liquidating Trust Agreement, as such Disputed Claims are resolved by Final Order, and such amounts shall be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date, provided that no interest shall be distributable or accrue with respect thereto.

## 3.    Manner of Distribution Under Plan and Liquidating Trust

Any distribution in Cash to be issued under the Plan or the Liquidating Trust Agreement shall, at the election of the issuer, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

## 4.    Delivery of Distributions

Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided herein, distributions and deliveries to Holders of record of Allowed Claims shall be made at the address of each such Holder set forth on the Debtor's books and records unless superseded by the address set forth on Proofs of Claim Filed by any such Holders.  By the Effective Date, the Debtor shall provide the Liquidating Trustee with the addresses and access to other books and records relating to the Liquidating Trust Beneficiaries, including all taxpayer identification information.

## 5.    Undeliverable Distributions

**Holding of Undeliverable Distributions.**  If any distribution to the Holder of an Allowed Claim under the Plan or the Liquidating Trust Agreement is returned as undeliverable, no further distributions shall be made to such Holder unless and until the issuer of the distribution is notified in writing of such Holder's then-current address.  Any Holder ultimately receiving a distribution that was returned as undeliverable shall not be entitled to any interest or other accruals of any kind on such distribution.  Nothing contained in the Plan or the Liquidating Trust Agreement shall require the issuer of any distribution to attempt to locate any Holder of an Allowed Claim.

**Failure to Claim Undeliverable Distributions**.  Any Holder of an Allowed Claim that does not assert its rights pursuant to the Plan or the Liquidating Trust Agreement to receive a distribution within three (3) months from and after the date such distribution is returned as undeliverable shall have such Holder's Claim for such undeliverable distribution discharged and shall be forever barred from asserting any such Claim against the Debtor, the Reorganized Debtor, the Liquidating Trust, the Liquidating Trustee and its respective professionals, or the Liquidating Trust Assets, as applicable.  In such case, any consideration held for distribution on account of such Claim in Class 5 and Class 6 shall belong to the Liquidating Trust for distribution by the Liquidating Trustee to the remaining Liquidating Trust Beneficiaries in accordance with the terms of the Plan and the Liquidating Trust Agreement.  After final distributions have been made in accordance with the terms of the Plan and the Liquidating Trust Agreement, if the amount of

undeliverable Cash remaining is less than $15,000, the Liquidating Trustee, in his or her sole discretion, may donate such amount to a charity without further notice or order of the Bankruptcy Court.

### 6.      Compliance with Tax Requirements/Allocation

The issuer of any distribution under the Plan or the Liquidating Trust shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit, and all distributions pursuant to the Plan or the Liquidating Trust shall be subject to any such applicable withholding and reporting requirements. For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest, if any.

### 7.      Time Bar to Cash Payments

Checks issued on account of Allowed Claims shall be null and void if not negotiated within sixty (60) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the issuer of the check by the Holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made within three (3) months from and after the date of issuance of such check. After such date, all Claims in respect of voided checks shall be discharged and forever barred, and the Liquidating Trust or the Reorganized Debtor, as applicable, shall be entitled to retain all monies related thereto for distribution in accordance with the terms of the Plan and Liquidating Trust Agreement, as applicable.

### 8.      Distributions After Effective Date

Distributions made after the Effective Date to Holders of Claims that are not Allowed as of the Effective Date, but which later become Allowed, shall be deemed to have been made on the Effective Date. Except as otherwise specifically provided in the Plan or the Liquidating Trust Agreement, as applicable, no interest shall be payable on account of any Allowed Claim not paid on the Effective Date.

### 9.      Fractional Dollars; De Minimis Distributions

Notwithstanding anything contained herein or in the Plan to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan or the Liquidating Trust, as applicable, would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. No payment shall be made on account of any distribution less than twenty-five dollars ($25) with respect to any Allowed Claim unless a request therefor is made in writing to the issuer of such payment on or before ninety (90) days after the Effective Date; _provided_, _however_, the Liquidating Trustee may make a payment of any amount with respect to any Allowed Class 5 or Class 6 Claims in its sole discretion.

10.    **Setoffs/Recoupment**

The Debtor, Reorganized Debtor or the Liquidating Trustee (as applicable) may, pursuant to applicable non-bankruptcy law, set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan or Liquidating Trust Agreement on account thereof (before any distribution is made on account of such Claim), the claims, rights and Causes of Action of any nature the Debtor, Reorganized Debtor or the Liquidating Trust may hold against the Holder of such Allowed Claim; *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, Reorganized Debtor or Liquidating Trust of any such Claims, rights and Causes of Action that the Debtor, the Reorganized Debtor or the Liquidating Trust may possess against such Holder; and, *provided*, *further*, that nothing contained herein is intended to limit any Creditor's rights of setoff or recoupment prior to the Effective Date in accordance with the provisions of sections 362 and 553 of the Bankruptcy Code, or other applicable law.

11.    **Preservation of Subordination Rights by Estate**

Except as otherwise provided in the Plan, all subordination rights and claims relating to the subordination by the Debtor, the Reorganized Debtor or the Liquidating Trustee of any Allowed Claim shall remain valid, enforceable and Unimpaired in accordance with section 510 of the Bankruptcy Code or otherwise.

G.    **Procedures for Resolution of Disputed, Contingent and Unliquidated Claims**

1.    **Prosecution of Objections to Disputed Claims**

Upon the Effective Date, the Liquidating Trustee shall be responsible for pursuing any objection to the allowance of all Disputed Claims in Class 5 or Class 6 in accordance with Bankruptcy Code section 506(a), with respect to which an objection has been Filed with the Bankruptcy Court and notice thereof has been given to the Holder of the Disputed Claim.  Prior to the Effective Date, the Debtor shall have the right to object to the allowance of Claims with respect to which they dispute liability or allowance in whole or in part and after the Effective Date, the Reorganized Debtor shall be responsible for pursuing any objection with respect to Administrative Expense Claims, Professional Fee Claims, and Claims in Classes 2 - 4.

The Liquidating Trustee shall have the authority to file, settle, compromise or withdraw any objections to Disputed Claims to which the Liquidating Trustee is entitled to object under the Plan (within any parameters as may be established by the Liquidating Trust Agreement) without approval of the Bankruptcy Court.  However, the Bankruptcy Court may nevertheless consider motions to approve any compromises and settlements in accordance with Bankruptcy Rule 9019.

After the Effective Date, the Reorganized Debtor shall have the authority to file, settle, compromise or withdraw any objections to Disputed Claims in Classes 2 - 4 without approval of the Bankruptcy Court.  However, the Bankruptcy Court may nevertheless consider motions to approve any compromises and settlements in accordance with Bankruptcy Rule 9019.

Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Disputed Claims shall be served and Filed by the Claims Objection Deadline.

4897-3798-2723.22 32903.00002

### 2. Estimation of Claims

The Debtor, prior to the Effective Date, and thereafter the Liquidating Trustee in accordance with the Liquidating Trust Agreement or the Reorganized Debtor, as applicable, may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Liquidating Trustee previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute the maximum Allowed amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor, the Liquidating Trustee or the Reorganized Debtor, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 3. Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Class of Claims are Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine that controversy before the Confirmation Date.

### 4. Payments and Distributions on Disputed Claims

Notwithstanding any provision of the Plan to the contrary, any issuer of a distribution hereunder may, in its discretion, pay the undisputed portion of a Disputed Claim. Notwithstanding the foregoing, the issuer of a distribution under the Plan will set aside for each Holder of a Disputed Claim such portion of Cash it believes solely in its discretion necessary to provide required distributions if that Claim were an Allowed Claim, either based upon the amount of the Claim as Filed with the Bankruptcy Court or the amount of the Claim as estimated by the Bankruptcy Court.

At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the issuer of a distribution hereunder shall distribute to the Holder thereof the distributions, if any, to which such Holder is then entitled under the Plan or the Liquidating Trust. Such distribution, if any, will be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order. No interest will be paid on Disputed Claims that later become Allowed, or with respect to any distribution in satisfaction thereof to a Holder.

### H. Conditions Precedent to Confirmation and the Effective Date

### 1. Conditions Precedent to Confirmation

The following are conditions precedent to confirmation of the Plan that must be (a) satisfied or (b) waived in accordance with section IX.C of the Plan:

a.  The entry of the Disclosure Statement Order, in form and substance reasonably satisfactory to the Debtor, the Committee, the Prepetition Agent and to the DIP Agent.

b.  The entry of the Confirmation Order by the Bankruptcy Court in form and substance reasonably satisfactory to the Debtor, the Committee, the Prepetition Agent and to the DIP Agent.

c.  The Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance reasonably satisfactory to the Debtor, the Committee, the Prepetition Agent and the DIP Agent and approved by the Bankruptcy Court.

d.  Each of the Professionals, including the Professionals for the Debtor and the Committee, shall have submitted to the DIP Agent an estimate of their anticipated Professional Fee Claims through the Effective Date.

e.  The occurrence of the Confirmation Date.

**2.  Conditions Precedent to Effective Date**

The following are conditions precedent to the Effective Date of the Plan that must be (a) satisfied or (b) waived in accordance with section IX.C of the Plan:

a.  Confirmation shall have occurred.

b.  There shall not be in effect on the Effective Date any (i) Order entered by a U.S. court, (ii) any order, opinion, ruling or other decision entered by any other court or governmental entity or (iii) United States or other applicable law staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan.

c.  The Administrative Expense Claims and Priority Claims anticipated to be Allowed in the Chapter 11 Case shall not exceed $75,000 over the aggregate budgeted amounts for such claims pursuant to the DIP Order.

d.  All other actions and documents necessary to implement the Plan shall have been effected or executed, including execution of the Liquidating Trust Agreement in form and substance satisfactory to the Debtor, the Committee, the Prepetition Agent, and to the DIP Agent.

e.  The Liquidating Trust Agreement shall have been fully executed and the Liquidating Trust Assets shall have been transferred to the Liquidating Trust.

f.  The DIP Financing Agreement and the other DIP Loan Documents (as defined therein) remain in full force and effect and have not been terminated.

g.  Each of the Order Approving Successful Bid and the Seattle Sale Order remains

in full force and effect and has not been modified.

h.   The Bankruptcy Court has entered a Final Order determining that, notwithstanding Bankruptcy Code section 1141(d)(6), any Allowed Claim held by any domestic governmental unit is discharged as to the Reorganized Debtor pursuant to Bankruptcy Code section 1141(d)(1).

### 3.      Waiver of Conditions Precedent

The Debtor, with the prior written consent of the DIP Agent, the Prepetition Agent and the Committee, may waive the conditions listed in Article IX of the Plan, and such waiver may be without notice to parties in interest or the Bankruptcy Court and without a hearing.

### 4.      Effect of Non-Occurrence of Effective Date

In the event that the conditions to the occurrence of the Effective Date have not been timely satisfied or waived pursuant to section IX.C of the Plan, and upon notification Filed by the Debtor with the Bankruptcy Court, the Confirmation Order shall be vacated and the Debtor and all parties in interest shall be restored to the *status quo ante*.  If the Confirmation Order is vacated the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor; (b) prejudice in any manner the rights of the Debtor or any other Person or Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtor in any respect.

## I.      Settlement, Discharge, Release, Exculpation, Injunctive and Related Provisions

### 1.      Compromise and Settlement of Claims, Equity Interests, and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of substantially all Claims, Equity Interests, and controversies relating to the contractual, legal, and equitable rights that a Holder of a Claim or Equity Interest may have with respect to any Claim or Equity Interest or any distribution to be made on account of such Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, the Estate, and Holders, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle claims against it.

Pursuant to Sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise, integral to the Plan, of substantially all Claims and controversies among the Debtor, the Committee, the DIP Lender, the Prepetition Agent and the Prepetition Lenders, including, without limitation, any Challenges by the Committee whether or not asserted, the 3012 Motion, claims and causes of actions against the

36

DIP Lender and claims and causes of actions against the Debtor and its Related Parties. Provided the aggregate Allowed Professional Fee Claims of the Committee's Professionals do not exceed the Committee Professional Budget, the DIP Lender and the Prepetition Agent shall not object to or challenge or cause any other person or entity to object to or challenge the award, allowance and payment of the Allowed Professional Fee Claims of the Debtor and the Committee. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, the Estate and Holders, and is fair, equitable and reasonable.

## 2.     Discharge of Claims and Termination of Interests

Pursuant to sections 1141(a), (c), and (d) of the Bankruptcy Code, and notwithstanding any language to the contrary in such sections, except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, of Claims, Equity Interests, and causes of action of any nature whatsoever by any Person or Entity, including any interest accrued on any Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtor, the Estate, or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and causes of action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by employees of the Debtor before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Equity Interest has accepted the Plan, effective as of the Effective Date. Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, the Confirmation Order shall be a judicial determination of the complete and full discharge of all Claims and Equity Interests by any Person or Entity, subject to the Effective Date occurring. Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all property of the Estate, including the Retained IP, shall vest in the Reorganized Debtor, free and clear of all Claims, Liens and Equity Interests of any Person or Entity and with the full and complete discharge of any and all Claims, Liens, Equity Interests or causes of action of any Person or Entity.

## 3.     Releases by Holders of Claims

*As of the Effective Date, for good and valuable consideration, unless such Holder elects on its ballot to opt out of the release provided herein, each Holder of a Claim that is eligible to vote to accept or reject the Plan that has affirmatively voted to accept the Plan, shall be deemed to have unconditionally released and discharged the Released Parties from any and all claims,*

*obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any claims or causes of action that have been or could be asserted by or on behalf of the Debtor or the Estate or that are derivative or duplicative of any such claims or causes of action, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Holder of a Claim could have been legally entitled to assert in its own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, in any way relating or pertaining to (a) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtor, (b) the Debtor or the operation or conduct of the business of the Debtor, (c) the Chapter 11 Case and/or (d) the negotiation, formulation and preparation of the Plan, or any related agreements, instruments or other documents; provided that these releases will have no effect on the liability of any Released Party arising from any act, omission, transaction, agreement, event or other occurrence, constituting fraud, criminal conduct, gross negligence or willful misconduct.  The releases set forth in this paragraph shall be binding upon and shall inure to the benefit of the Reorganized Debtor and the Liquidating Trustee and any other successor to the Debtor or the Estate.  Each ballot will have a place for a party to opt out of the release provided herein.  Nothing in the foregoing or elsewhere in the Plan constitutes a waiver or release of any right to receive distributions from the Reorganized Debtor or the Liquidating Trust, as applicable, or of any portion of a Claim supporting such right.*

"*Released Party*" or "*Released Parties*" means, subject to any exclusions expressly set forth in the Plan and other than the Excluded Parties, the Debtor, the Estate, the Committee, each of the DIP Lenders, the DIP Agent, each of the Prepetition Lenders, the Prepetition Agent and each of their respective successors and current and former control persons, trustees or beneficiaries, direct or indirect shareholders or members, officers, directors, employees, affiliates, principals and agents (and each of their respective attorneys, consultants, financial advisors, investment bankers, accountants, and other retained professionals), in each case solely in their capacities as such.

## 4.    Injunction

*Except as otherwise expressly provided for herein or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons and Entities that have held, hold, or may hold claims, interests, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, or causes of actions that have been released or exculpated under the Plan or Confirmation Order are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, any of the Released Parties or the Exculpated Parties (collectively, the "Enjoined Matters"): (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Enjoined Matters; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Released Parties and the Exculpated Parties on account of or in connection with or with respect to any Enjoined Matters; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against the Released Parties and the Exculpated Parties on account of or in connection with or with respect to Enjoined Matters; (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Released Parties and the Exculpated Parties or their*

38

*property on account of or in connection with or with respect to any Enjoined Matters unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date or has Filed a Proof of Claim or proof of Equity Interest indicating that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Enjoined Matters. Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any obligations arising on or after the Effective Date of any Person or Entity under the Plan (including the Debtor's obligations pursuant to the Plan of the Confirmation Order).*

*The Vested Causes of Actions constitute assets of the Debtor's Estate, and from and after the Effective Date, the terms of the Plan and any Confirmation Order, constitute Liquidation Trust Assets to be prosecuted, settled, dismissed, or otherwise resolved in accordance with the provisions of the Plan and the Liquidating Trust Agreement and any other Person is stayed and enjoined from proceeding with such Vested Causes of Actions pursuant to the provisions of Section 362 of the Bankruptcy Code.*

### 5.    Releases by the Debtor and its Estate

*As of the Effective Date, for good and valuable consideration, solely in the event that Class 5 votes to accept the Plan, the Debtor and its Estate shall unconditionally release and discharge Trade Creditors from all Avoidance Actions arising under Section 547 of the Bankruptcy Code, provided that these releases will have no effect on the liability of any Trade Creditor arising from any act, omission, transaction, agreement, event or other occurrence, constituting fraud, criminal conduct, gross negligence or willful misconduct.  For avoidance of doubt, these releases shall have no effect on any and all Avoidance Actions against Trade Creditors, except as otherwise expressly provided in the Plan.*

*As of the Effective Date, for good and valuable consideration, the Debtor and its Estate shall unconditionally release the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders from any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any claims or causes of action that have been or could be asserted by or on behalf of the Debtor or the Estate or that are derivative or duplicative of any such claims or causes of action, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtor or the Estate could have been legally entitled to assert in its own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, in any way relating or pertaining to (i) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtor, (ii) the Debtor or the operation or conduct of the business of the Debtor, (iii) the Chapter 11 Case and/or (iv) the negotiation, formulation and preparation of the Plan, or any related agreements, instruments or other documents; provided that these releases will have no effect on the liability of any DIP Agent, DIP Lender, Prepetition Agent or Prepetition Lender arising from any act, omission, transaction, agreement, event or other occurrence, constituting fraud, criminal conduct, gross negligence or willful misconduct.*

39

6.      **Necessity and Approval of Releases and Injunctions**

The releases and injunctions set forth in Article X of the Plan are integral and critical parts of the Plan and the settlements implemented pursuant to the Plan, the approval of such releases pursuant to the Confirmation Order is a condition to the occurrence of the Effective Date, and all the Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Bankruptcy Court's retention of jurisdiction to enforce such releases and injunctions when making concessions pursuant to the Plan and by agreeing to, accepting, and supporting the settlement and treatment of their respective Claims, causes of action, and other rights under the Plan.

7.      **Exculpation**

*The Exculpated Parties shall neither have nor incur any liability to any Person or Entity (including any Holder of a Claim or Equity Interest) for any post-petition act taken or omitted to be taken in connection with or related to the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation or occurrence of the Effective Date, the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtor or the Chapter 11 Case; provided that in the case of the Debtor's directors and officers, this exculpation provision applies only to the directors and officers who served in such capacity on and after the Petition Date for allegedly wrongful acts occurring after the Petition Date.*

"*Exculpated Parties*" means the Debtor, the Reorganized Debtor, the members of the Committee, the Liquidating Trustee and the Liquidating Trust, and their respective officers, directors, members, employees and agents (and their respective attorneys, consultants, financial advisors, investment bankers, accountants and other retained professionals, including, for the avoidance of doubt, the Debtors' and the Committee's Professionals).

J.      <u>**Vesting and Preservation of Certain Causes of Action**</u>

1.      **Vesting of the Vested Causes of Action**

Except as otherwise provided in the Plan, the Vested Causes of Action shall, on the Effective Date, automatically and irrevocably vest in the Liquidating Trust free and clear of liens, claims, encumbrances and interests.  The Liquidating Trustee, on behalf of the Liquidating Trust, shall have the sole and exclusive right, authority, and discretion to institute, commence, pursue, prosecute, abandon, settle, or compromise any and all Vested Causes of Action (under any theory of law, including the Bankruptcy Code, and in any court or other tribunal) without the consent or approval of any third party and without any further order of the Bankruptcy Court, except as otherwise provided herein or in the Liquidating Trust Agreement.  From and after the Effective Date, the Liquidating Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the Liquidating Trust, shall serve as a representative of the Estate and shall retain and possess the sole and exclusive right to commence, pursue, settle, compromise or abandon, as

appropriate, any and all Vested Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal.

### 2. Reservation of Rights Regarding Vested Causes of Action

The Debtor and, after the Effective Date, the Liquidating Trustee, on behalf of the Liquidating Trust, reserve all rights to pursue any and all Vested Causes of Action, and the Debtor hereby reserves the rights of the Liquidating Trust and the Liquidating Trustee, on behalf of the Liquidating Trust, to pursue, administer, settle, litigate, enforce and liquidate consistent with the terms and conditions of the Plan such Vested Causes of Action.

Unless Vested Causes of Action against a Person or Entity are expressly waived, relinquished, released, compromised or settled in the Plan, or any Final Order, the Debtor (before the Effective Date) and the Liquidating Trustee, on behalf of the Liquidating Trust (post-Effective Date), expressly reserve all Vested Causes of Action for later adjudication, and no Person or Entity may rely on any alleged failure to list, specify, or otherwise disclose any particular Vested Causes of Action in connection with the Plan as a defense in any litigation regarding such Vested Causes of Action. In addition, the Debtor and the Liquidating Trustee, on behalf of the Liquidating Trust and any successors in interest thereto, expressly reserve the right to pursue or adopt any Vested Causes of Action not so waived, relinquished, released, compromised or settled that are alleged in any lawsuit in which the Debtor are a defendant or an interested party, against any Person or Entity, including the plaintiffs and co-defendants in such lawsuits.

### 3. Covenant Not to Execute on Judgment

Notwithstanding the vesting of the Vested Causes of Action in the Liquidating Trust, the Liquidating Trustee is deemed to covenant not to execute any judgment of any Vested Cause of Action against an Excluded Party, or any settlement of any Vested Cause of Action with any Excluded Party, in excess of the amount of available insurance proceeds available from the D&O Liability Insurance Policies.

## K. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over any matter arising under the Bankruptcy Code, or arising in or related to the Chapter 11 Case or the Plan after Confirmation and after the Effective Date, and any other matter or proceeding that is within the Bankruptcy Court's jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157, or 28 U.S.C. § 1367, including jurisdiction to matters set forth in Article XII of the Plan.

## L. Miscellaneous Provisions

### 1. Immediate Binding Effect

Subject to Article IX of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, the Liquidating Trust, and any and all Holders of Claims or Equity

Interests (irrespective of whether their Claims or Equity Interests accepted the Plan), all Persons or Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Person or Entity acquiring property under the Plan, and any and all non-debtor parties to executory contracts and unexpired leases with the Debtor.

### 2.     Plan Supplement

The Plan Supplement may be inspected in the office of the Bankruptcy Clerk or its designee during normal business hours.  Holders of Claims and Equity Interests may obtain a copy of the Plan Supplement by contacting the Voting Agent, or by visiting https://veritaglobal.net/gritstone. The documents contained in the Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

### 3.     Payment of Statutory Fees and Provision of Reports

All fees payable pursuant to section 1930(a) of Title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed or closed, whichever occurs first, responsibility for which shall belong to the Liquidating Trustee and Debtor, as applicable.  For the avoidance of doubt, the Reorganized Debtor shall not be liable for any such fees.  Further, the Liquidating Trustee and the Debtor, as applicable, shall be responsible for filing post-Confirmation quarterly reports with the U.S. Trustee until the Chapter 11 Case is converted, dismissed or closed; _provided_, _however_, that upon notification by the Debtor or Reorganized Debtor, as applicable, that it no longer requires the Chapter 11 Case to remain open, from and after such date the responsibility for any U.S. Trustee fee or to file reports shall be solely and exclusively by the Liquidating Trustee.  Any such post-Confirmation quarterly report shall be with respect to the Liquidating Trust and no post-Confirmation quarterly report shall be required with respect to the Reorganized Debtor.

### 4.     Plan Modification/Amendment

Subject to the limitations contained in the Plan:

(a)     The Plan may be amended or modified with the consent of the Debtor the DIP Agent and following consultation with the Committee and the Prepetition Agent (i) before the Confirmation Date, to the extent permitted by section 1127 of the Bankruptcy Code; (ii) after the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, to the extent the Debtor institutes proceedings in the Bankruptcy Court, pursuant to section 1127(b) of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order or to accomplish such matters as may be necessary or appropriate to carry out the purposes and effects of the Plan; _provided_ that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or Orders of the Bankruptcy Court; or (iii) after the entry of the Confirmation Order, upon order of the Bankruptcy Court in accordance with section 1127(b) of the Bankruptcy Code; _provided_, _further_, that the Plan will not be amended, modified or revoked without the consent of the Debtor and the DIP Agent, and the written consent of the Committee and the Prepetition Agent to the extent any amendment, modification or revocation materially affects the Committee (or its constituency) or

the Prepetition Agent, respectively (including, for the avoidance of doubt, any change to the distribution to Holders of Class 1 Claims, the Trust Funding Amount, or the Initial Trust Distribution).

(b)     The Debtor reserves the right to modify or amend the Plan upon a determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code.  To the extent permissible under section 1127 of the Bankruptcy Code without the need to re-solicit acceptances, the Debtor reserves the right to sever any provisions of the Plan that the Bankruptcy Court finds objectionable. Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

(c)     After the Effective Date, the Liquidating Trustee may amend or modify, upon order of the Bankruptcy Court, the Plan in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan solely as to Class 5, Class 6 and/or the Liquidating Trust, the Liquidating Trustee or Liquidating Trust Beneficiaries.

## 5.     Revocation of Plan

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization or liquidation.  If the Debtor revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Person or Entity, (ii) prejudice in any manner the rights of the Debtor or any other Person or Entity, or (iii) constitute an admission of any sort by the Debtor or any other Person or Entity.

## 6.     Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

## 7.     Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained therein or herein, or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

8.      **Good Faith**

Confirmation of the Plan shall constitute a conclusive determination that:  (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of Bankruptcy Code, and the Bankruptcy Rules; and, (c) in each case, all the Released Parties have acted in good faith in connection therewith.

9.      **Section 1146 Exemption**

Pursuant to section 1146(a) of the Bankruptcy Code, under the Plan, (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtor; (b) the creation, modification, consolidation or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment or recording of any lease or sublease; or (d) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan shall not be subject to any document recording tax, mortgage recording tax, stamp tax or similar government assessment, and the appropriate state or local government official or agent shall be directed by the Bankruptcy Court to forgo the collection of any such tax or government assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or government assessment.

All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtor in the Chapter 11 Case, whether in connection with a sale pursuant to section 363 of the Bankruptcy Code or otherwise, shall be deemed to be or have been done in furtherance of the Plan.

10.      **Further Assurances**

The Holders of Claims receiving distributions under the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Liquidating Trust Agreement.

11.      **Post-Effective Date Fees and Expenses**

From and after the Effective Date, the Liquidating Trustee, on behalf of the Liquidating Trust, shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Liquidating Trust and the Reorganized Debtor, and any professionals retained by such Liquidating Trust or the Reorganized Debtor, as applicable, related to the consummation and to the implementation of the Plan, except as otherwise provided in the Liquidating Trust Agreement.

12.      **Conflicts**

4897-3798-2723.22 32903.00002

To the extent any provision of the Liquidating Trust Agreement, the Disclosure Statement, or any document executed in connection therewith or any documents executed in connection with the Confirmation Order (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing) conflicts with, or is in any way inconsistent with, the terms of the Plan, the terms and provisions of the Plan shall govern and control and to the extent any provision of the Plan conflicts with, or is in any way inconsistent with, the terms and provisions of the Confirmation Order, the terms and provisions of the Confirmation Order shall govern and control.

13.     **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and still extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the closing of the Chapter 11 Case in accordance with section XIII.S of the Plan.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

14.     **Closing of the Chapter 11 Case**

The Liquidating Trustee shall promptly, upon the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by the Bankruptcy Rules and any applicable orders of the Bankruptcy Court to close the Chapter 11 Case.

15.     **Change of Control Provisions**

Any acceleration, vesting or similar change of control rights under any employment, benefit or other arrangements triggered by the consummation of the Plan shall be waived or otherwise cancelled under the Plan.

IV.
**VOTING REQUIREMENTS; ACCEPTANCE
AND CONFIRMATION OF THE PLAN**

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtor, including that (a) the Plan has classified Claims and Equity Interests in a permissible manner, (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Debtor has complied with applicable provisions of the Bankruptcy Code, (d) the Debtor has proposed the Plan in good faith and not by any means forbidden by law, (e) the disclosure required by section 1125 of the Bankruptcy Code has been made, (f) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (g) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, (h) the Plan is in the "best interests" of all holders of Claims or Equity Interests in an impaired Class by providing to such holders on account of their Claims or Equity Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless the Holder has accepted the Plan, and (i) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the

45

Bankruptcy Court at the hearing on Confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

## A.    Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only classes of claims and interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the plan are entitled to vote to accept or reject the Plan.  A class is impaired if the legal, equitable, or contractual rights to which the claims or equity interests of that class entitled the holders of such claims or equity interests are modified, other than by curing defaults and reinstating the debt.  Classes of claims and interests that are not impaired are not entitled to vote on the plan and are conclusively presumed to have accepted the plan.  In addition, classes of claims and interests that receive no distributions under the plan are not entitled to vote on the plan and are deemed to have rejected the plan.

## B.    Classes Impaired Under the Plan

Class 1 (Prepetition Secured Claims), Class 3 (Secured Tax Claims), Class 4 (Priority Non-Tax Claims), Class 5 (General Unsecured Claims), Class 6 (Convenience Claims), Class 7 (Subordinated Claims) and Class 8 (Equity Interests) are Impaired under the Plan.  Acceptances of the Plan are being solicited only from members in Impaired Classes that will or may receive a distribution under the Plan and that are not deemed to have voted for the Plan.  Accordingly, the Debtor is soliciting acceptances from members of Classes 1, 3, 4, 5 and 6 only.  Classes 7 and 8 are receiving no distribution under the Plan and are therefore deemed to reject the Plan.

## C.    Voting Procedures and Requirements

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement.  In addition, you may vote to opt out of the releases provided under the Plan to the Released Parties.

If you are a member of voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please call Debtor's voting agent, Verita Global, at [_____], or international: [_____].  PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY.  YOU SHOULD COMPLETE AND SIGN YOUR BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE TO:

**Gritstone Bio, Inc.**
**c/o Verita Global**
**222 N. Pacific Hwy., 3rd Fl.**
**El Segundo, CA  90245**

VOTES CANNOT BE TRANSMITTED ORALLY.  FACSIMILE BALLOTS WILL NOT BE ACCEPTED.  TO BE COUNTED, ORIGINAL SIGNED BALLOTS MUST BE RECEIVED ON OR BEFORE [_____], 2025, AT 4:00 P.M., PREVAILING EASTERN TIME.  IT IS OF THE UTMOST IMPORTANCE TO THE DEBTOR THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.

**D.**     <u>**Confirmation Standards**</u>

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.
- The Debtor has complied with the applicable provisions of the Bankruptcy Code.
- The Plan has been proposed in good faith and not by any means forbidden by law.
- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.
- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code. With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code.
- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.
- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Holders of Claims specified in section 507(a)(2) will receive, without interest, Cash equal to the Allowed amount of such Claim: (i) on or as soon as practicable after the later of (a) the Effective Date, and (b) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (ii) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtor or the Liquidating Trustee, as the case may be; (iii) with respect to any Claims representing obligations incurred in the ordinary course of the Debtor's business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtor's business or as otherwise provided in the Plan; or (iv) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), such fees will be paid as and when due under applicable law.

4897-3798-2723.22 32903.00002

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.
- Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.
- The Debtor has paid or the Plan provides for the payment of the required fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

### E.    Best Interests Test

In order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of each Holder of a Claim or Equity Interest in any such impaired Class who has not voted to accept the Plan.  Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

### F.    Liquidation Analysis

Based upon the Debtor's current projections, Holders of Allowed Other Administrative Expense Claims, Priority Tax Claims, Other Secured Claims (if applicable), Secured Tax Claims, and Priority Non-Tax Claims will be paid in full under the Plan (subject to the terms of the Plan), while Holders of Allowed General Unsecured Claims will receive a projected distribution of approximately 11% (based on various assumptions). *See* **Exhibit B** (Liquidation Analysis Supplement) attached hereto.

If the Chapter 11 Case were converted to a Chapter 7 case, first and foremost, the Estate would not have the benefit of the Trust Funding Amount and the Vested Causes of Action, to provide a recovery for general unsecured creditors under the Plan, and thus, general unsecured creditors would likely receive no recovery in a Chapter 7 proceeding.  Further, the Debtor's estate would incur the costs of payment of a statutorily allowed commission to the Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee.  The Debtor believes that such amounts would exceed the amount of expenses that will be incurred in implementing the Plan.  The Debtor contemplates an orderly administration and monetization or other disposition of the Liquidating Trust Assets by parties that are already familiar with the Debtor, its assets and affairs, and its creditors and liabilities.  Such familiarity will allow the Liquidating Trust to complete liquidation of the Liquidating Trust Assets (including prosecution of Vested Causes of Action), and distribute the net proceeds to creditors more efficiently and expeditiously than a Chapter 7 trustee. Additionally, the Estate would suffer additional delays, as a Chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the Estate (including the prosecution of Causes of Action).  Also, a new time period for the filing of claims would commence under Bankruptcy Rule 1019(2), possibly resulting in the filing of additional Claims against the Estate.

Based upon the foregoing and Exhibit B (Liquidation Analysis Supplement) attached hereto, the Debtor believes that creditors will receive at least as much or more under the Plan than they would receive if the Chapter 11 Case were converted to a Chapter 7 case.

## G.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization). To determine whether the Plan meets this feasibility requirement, the Debtor, with the assistance of its advisors, has analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtor has prepared the Financial Projections, which are incorporated herein by reference. Based upon the Financial Projections, the Debtor believes that it will be a viable operation following the Chapter 11 Case and that the Plan meets the feasibility requirements of the Bankruptcy Code.

## H.    Acceptance by Impaired Classes

Bankruptcy Code section 1129(b) provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it. The process by which nonaccepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown." The Bankruptcy Court may confirm the Plan at the request of the Debtor notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A class of claims under a plan accepts the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote on the plan. A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (1) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified, or (2) the effect of any default is cured and the original terms of the obligation are reinstated.

A plan is fair and equitable as to a class of secured claims that rejects the plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the

claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

AS CLASS 7 SUBORDINATED CLAIMS AND CLASS 8 EQUITY INTERESTS ARE DEEMED TO REJECT THE PLAN, THE DEBTOR INTENDS TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE WITH RESPECT TO SUCH CLASS.  FURTHER, THE DEBTOR WILL REQUEST CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) WITH RESPECT TO ANY OTHER IMPAIRED CLASS ENTITLED TO VOTE ON THE PLAN THAT DOES NOT ACCEPT THE PLAN.

I.    **Compliance with the Applicable Provisions of the Bankruptcy Code**

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code.  The Debtor has considered each of these issues in the development of the Plan and believes that the Plan complies with all applicable provisions of the Bankruptcy Code.

**II.**
**ALTERNATIVES TO CONFIRMATION AND**
**CONSUMMATION OF THE PLAN**

The Debtor believes that the Plan affords Holders of Claims the potential for the maximum distribution on account of their claims and, therefore, is in the best interests of such Holders.  If the Plan is not confirmed, the only viable alternatives are dismissal of the Chapter 11 Case or conversion to Chapter 7 of the Bankruptcy Code.  For the reasons described herein, neither of these alternatives is preferable to confirmation and consummation of the Plan.

If the Chapter 11 Case were dismissed, creditors would revert to a "race to the courthouse," the result being that creditors would not receive a fair and equitable distribution of the Debtor's remaining assets.  Moreover, as set forth above, the Debtor believes the Plan provides a greater recovery to creditors than would be achieved in a Chapter 7 case.  Therefore, a Chapter 7 case is

not an attractive or superior alternative to the Plan.  Thus, the Plan represents the best available alternative for maximizing returns to creditors.

## III.
## RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

### A.   Risks Relating to Confirmation and Consummation of the Plan

#### 1.   Parties in Interest May Object to Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

#### 2.   The Debtor May Object to a Claim or Equity Interest

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim or Equity Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is or may become subject to an objection, counterclaim or other suit by the Debtor.  Thus, any Holder of a Claim or Equity Interest that is or may become subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

#### 3.   The Debtor May Fail to Satisfy the Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtor may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims or Equity

4897-3798-2723.22 32903.00002

Interests as those proposed in the Plan.

### 4.      Plan May Not Be Accepted, Confirmed or Consummated

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

The Debtor reserves the right to modify the terms and conditions of the Plan as necessary for confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.  Section 1127 of the Bankruptcy Code permits the Debtor to modify the Plan at any time before confirmation, but not if such modified Plan fails to meet the requirements for confirmation.  The Debtor may modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for confirmation.  The Debtor will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan.  Any Holder of a Claim or Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

### 5.      Non-Consensual Confirmation of the Plan May Be Necessary

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined

without including the vote of any "insider" in such class) ("Accepting § 1129(a)(10) Class") and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If there is an Accepting § 1129(a)(10) Class, the Debtor believes that the Plan satisfies these other requirements, and the Debtor may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that a Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

## B. Risks Relating to the Chapter 11 Process

### 1. The Debtor's Exclusivity Period May Terminate

At the outset of the Chapter 11 Case, the Bankruptcy Code provides the Debtor with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtor will have retained the exclusive right to propose the Plan upon filing its petition. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve confirmation of the Plan in order to achieve the Debtor's goals.

### 2. Continuation of the Chapter 11 Case May Harm the Debtor's Estate

A prolonged continuation of the Chapter 11 Case may adversely affect the Debtor's Estate. So long as the Chapter 11 Case continues, the Debtor may be required to incur substantial costs for professional fees and other expenses associated with the proceedings.

### 3. The Chapter 11 Case May Be Converted to a Case Under Chapter 7

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of, among other things, [the lack of the GUC Fund and] the additional administrative expenses involved in the appointment of a chapter 7 trustee.

## C. Risks Relating to Recoveries Under the Plan

The projected distributions set forth in this Disclosure Statement are based upon the Debtor's good-faith estimate of the amount of expenses that will be incurred and total amount of Claims in each Class that will ultimately be Allowed. The actual amount of such expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative and litigation costs associated with resolving Disputed Claims. Additionally, the actual amount of Allowed Claims in any class could be greater than anticipated, which would impact the distributions to be made to Holders of Claims.

## D. Risks Relating to the Reorganized Debtor

1. **The Reorganized Debtor May Not Be Able to Achieve Its Projected Financial Results**

The Reorganized Debtor may not be able to achieve its projected financial results. The financial projections attached hereto as **Exhibit C** (the "Financial Projections") represent the Debtor's management's best estimate of the Debtor's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtor's operations, as well as the United States and world economies in general, and the industry segments in which the Debtor operates in particular. While the Debtor believes that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtor does not achieve its projected financial results, the value of the New Equity Interests may be negatively affected and the Debtor may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

2. **The Reorganized Debtor May Not Be Able to Generate Sufficient Cash to Service All of Its Indebtedness**

The Reorganized Debtor's ability to make scheduled payments on, or refinance its debt obligations, depends on the Reorganized Debtor's financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtor's control. The Reorganized Debtor may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtor to pay the principal, premium, if any, and interest on its indebtedness, including, without limitation, potential borrowings under the Exit Facility.

3. **The Debtor Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Case**

For the duration of the Chapter 11 Case, the Debtor's ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: the (a) ability to develop, confirm, and consummate the transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Case from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtor's operations; and (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtor. Such risks and uncertainties could affect the Debtor's business and operations in various ways. Because of the risks and uncertainties associated with the Chapter 11 Case, the Debtor cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Case that may be inconsistent with the Debtor's plans.

4. **Financial Results May Be Volatile and May Not Reflect Historical Trends**

The Financial Projections attached hereto as <u>Exhibit C</u> are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtor, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtor and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtor's operations. These variations may be material and may adversely affect the value of the New Equity Interests and the ability of the Debtor to make payments with respect to their indebtedness.  Lastly, the business plan was developed by the Debtor with the assistance of its advisors. There can be no assurances that the Debtor's business plan will not change, possibly materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtor and its business plan. Any deviations from the Debtor's existing business plan would necessarily cause a deviation.

**IV.**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

THE FOLLOWING IS INTENDED TO BE ONLY A SUMMARY OF SELECTED FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH, AND RECEIPT OF TAX ADVICE FROM, A TAX PROFESSIONAL. THE SELECTED FEDERAL TAX CONSEQUENCES THAT ARE DESCRIBED HEREIN AND OTHER FEDERAL, STATE AND LOCAL TAX CONSEQUENCES THAT ARE NOT ADDRESSED HEREIN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.  SUCH TAX CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST.  ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS STRONGLY ADVISED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.  THE BELOW SUMMARY OF TAX CONSEQUENCES IS NOT INTENDED TO BE AND IS NOT TAX ADVICE.

THE DEBTOR DOES NOT INTEND TO REQUEST A TAX RULING FROM THE INTERNAL REVENUE SERVICE OR ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN.  CONSEQUENTLY, THE INTERNAL REVENUE SERVICE OR ANOTHER TAXING AUTHORITY MAY DISAGREE WITH AND MAY CONTEST ONE OR MORE OF THE TAX CONSEQUENCES DESCRIBED HEREIN TO THE DEBTOR, HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS.

**A.**      **<u>Certain U.S. Federal Income Tax Consequences</u>**

The following discussion is a summary of certain material U.S. federal income tax consequences of the Plan to the Debtor and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims.  The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Plan.  This summary is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof

55

and all of which are subject to change or differing interpretations, possibly with retroactive effect. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below.  The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or to certain holders of Claims in light of their individual circumstances, nor does the discussion deal with tax issues with respect to holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies; banks or other financial institutions; brokers, dealers, or traders in securities; real estate investment trusts; governmental authorities or agencies; tax-exempt organizations; retirement plans; individual retirement or other tax-deferred accounts; certain expatriates or former long-term residents of the United States; small business investment companies; regulated investment companies;  S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners; persons whose functional currency is not the U.S. dollar; persons who use a mark-to-market method of accounting; persons required to report income on an applicable financial statement; persons holding Claims or Interests as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated transaction; and persons who are not U.S. Holders (as defined below)).  Furthermore, this discussion generally assumes that a holder of a Claim holds such claim as a "capital asset" within the meaning of section 1221 of the Internal Revenue Code (generally property held for investment), except as otherwise specifically discussed below.  This discussion does not address any U.S. federal non-income (including estate or gift), state, local, or foreign taxation, alternative minimum tax, or the Medicare tax on net investment income of certain holders.

If a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a holder of Claims or Interests, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership. A holder of a Claim or Interest that is a partnership and the partners in such partnership should consult their tax advisors with regard to the U.S. federal income tax consequences of the Plan.

## B.    <u>Tax Consequences in Relation to the Debtor</u>

As of December 31, 2023, the Debtor had a consolidated federal income tax net operating loss ("<u>NOL</u>") carryforward of approximately $406 million and federal R&D credit carryforwards of approximately $17 million, in addition to substantial other tax attributes (including capitalized R&D expense).  The Debtor expects that it generated an additional NOL and other tax attributes for the tax year ending December 31, 2024.

In general, cancellation of debt income ("<u>COD</u>") realized by a debtor on the discharge of debts in the context of a bankruptcy proceeding will not result in taxable income to the debtor, although it will cause the reduction in certain of the debtor's tax attributes (such as NOLs, capital loss carryforwards, tax credits, and tax basis in assets).  The amount of COD realized equals the excess of the adjusted issue price of indebtedness discharged over the sum of the amount of cash,

the issue price of any debt instrument and the fair market value of any other property given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction). If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. Where a debtor (such as the Debtor) joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

The Debtor may realize COD in connection with the implementation of the Plan as a result of the satisfaction of certain Claims that qualify as indebtedness for federal income tax purposes at a discount or for no consideration. As a result, the Debtor expects that its tax attributes will be reduced following the implementation of the Plan.

Any reduction in tax attributes under the COD rules does not occur until after such attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the COD is realized.

To the extent the Debtor has NOLs remaining after implementation of the Plan, the Debtor's ability to utilize those NOLs may be limited under section 382 of the Tax Code. Section 382 contains certain rules limiting the amount of NOLs a corporate taxpayer can utilize in each taxable year following an "ownership change." In general, an "ownership change" occurs whenever the percentage of the stock of a corporation owned, directly or indirectly, by "5-percent stockholders" (within the meaning of section 382) increases by more than 50 percentage points over the lowest percentage of the stock of such corporation owned, directly or indirectly, by such 5-percent stockholders at any time over the preceding three-year period. Certain special rules under Section 382 apply to corporations that experience an ownership change in connection with a bankruptcy proceeding and allow for conversion of qualifying debt to equity without causing an ownership change.

The Debtor believes it is possible that the consummation of the Plan will not result in an ownership change under section 382 because new equity interests are being received in exchange for qualifying debt and the Debtor is in a chapter 11 proceeding. The Debtor is continuing to evaluate whether the Plan would result in an ownership change, and, if so, the potential impact of Section 382 (including certain relief provisions of section 382 that may apply to an ownership change resulting from a bankruptcy restructuring) on its ability to utilize the NOLs that will remain following the implementation of the Plan and the application of the attribute reduction rules discussed above.

## C.    Tax Consequences for U.S. Holders of Certain Claims

Generally, a holder of a Claim should in most, but not all, circumstances recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim. The tax basis of a holder in a Claim will generally

be equal to the holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.

A creditor who receives Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is treated as a payment in respect of accrued but unpaid interest. A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, generally will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim. A creditor who previously included in its income accrued but unpaid interest attributable to its Claim may be entitled to recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such creditor realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

Under the Plan, the holders of certain Claims, including General Unsecured Claims in Class 5, will likely receive only a partial distribution of their Allowed Claims. Whether the applicable holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims. Creditors should consult their own tax advisors concerning this issue.

### D.    Tax Consequences in Relation to the Liquidating Trust

As of the Effective Date, the Liquidating Trust will be established for the benefit of the Liquidating Trust Beneficiaries. The tax consequences of the Plan in relation to the Liquidating Trust and the beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

The Liquidating Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan and Liquidating Trust Agreement, and in conformity with Revenue Procedure 94-45, *supra*, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) are required to treat for federal income tax purposes, the Liquidating Trust as a grantor trust of which the holders of Allowed Unsecured Claims are the owners and grantors. While the following discussion assumes that the Liquidating Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would

not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the beneficiaries thereof could materially vary from those discussed herein. Holders of Claims or Interests should consult their own tax advisors concerning the tax consequences to them if the Liquidating Trust were not to qualify as a grantor trust for U.S. federal income tax purposes.

In general, each creditor who is a beneficiary of the Liquidating Trust will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such beneficiary in satisfaction of its Allowed Claim, and (ii) such beneficiary's adjusted tax basis in such Claim. The "amount realized" by a Liquidating Trust Beneficiary will equal the sum of cash and the aggregate fair market value of the property received by such party pursuant to the Plan (such as a beneficiary's undivided beneficial interest in the assets transferred to the Liquidating Trust). Where gain or loss is recognized by a beneficiary in respect of its Allowed Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the party, whether the Claim constituted a capital asset in the hands of the party and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the party had previously claimed a bad debt deduction in respect of the Claim.

After the Effective Date, any amount that a creditor receives as a distribution from the Liquidating Trust in respect of its beneficial interest in the Liquidating Trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Unsecured Claim, but should be separately treated as a distribution received in respect of such party's beneficial interest in the Liquidating Trust.

In general, a beneficiary's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidating Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the beneficiary's holding period in such assets will begin the day following the Effective Date. Distributions to any Liquidating Trust Beneficiary will be allocated first to the original principal portion of the beneficiary's Allowed Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will treat the transfer of assets to the Liquidating Trust, in accordance with the terms of the Plan and Liquidating Trust Agreement, as a transfer of those assets directly to the holders of the applicable Allowed Claims followed by the transfer of such assets by such holders to the Liquidating Trust. Consistent therewith, all parties will treat the Liquidating Trust as a grantor trust of which such holders are to be owners and grantors. Thus, such holders (and any subsequent holders of interests in the Liquidating Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Liquidating Trust for all federal income tax purposes. Accordingly, each holder of a beneficial interest in the Liquidating Trust will be required to report on its federal income tax return(s) the holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to the Liquidating Trust's claims reserves) among the Liquidating Trust Beneficiaries will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its assets (valued at their tax basis) to the holders of the beneficial interests in the Liquidating Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax basis of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.  Uncertainties with regard to federal income tax consequences of the Plan may arise due to the inherent nature of estimates of fair market value that will impact tax liability determinations.

The federal income tax reporting obligation of a holder of a beneficial interest in the Liquidating Trust is not dependent upon the Liquidating Trust distributing any cash or other proceeds.  Therefore, a holder of a beneficial interest in the Liquidating Trust may incur a federal income tax liability regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the holder.  If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Liquidating Trust it holds, the holder may be allowed a subsequent or offsetting loss.

The Liquidating Trustee will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).  The Liquidating Trust will also send to each holder of a beneficial interest in the Liquidating Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "Trust Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the trust assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors.  All parties (including, without limitation, the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will be required to report for tax purposes consistently with the foregoing.

4897-3798-2723.22 32903.00002

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

E.    **Information Reporting and Withholding**

In connection with the Plan, the Debtor will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all distributions under the Plan will be subject to those withholding and information reporting requirements.  Holders of Claims may be required to provide certain tax information as a condition to receiving distributions pursuant to the Plan.

In general, information reporting requirements may apply to distributions pursuant to the Plan.  Additionally, under the backup withholding rules, a holder may be subject to backup withholding with respect to distributions made pursuant to the Plan, unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding.  Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund, provided the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES.  EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE PLAN.

V.

**RECOMMENDATION**

The Debtor strongly recommends that all creditors receiving a Ballot vote in favor of the Plan.  The Debtor believes that the Plan is in the best interests of creditors.  The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Case dismissed or converted under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE

61

DEBTOR BELIEVES THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES.  THE DEBTOR URGES ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY 4:00 P.M. EASTERN TIME ON [_____], 2025.


Dated:  January 15, 2025                By: /s/ Vassiliki Economides
                                            Vassiliki Economides
                                            Chief Financial Officer of
                                            Gritstone bio, Inc.

# EXHIBIT A

# (THE PLAN)

# EXHIBIT B

# (LIQUIDATION ANALYSIS SUPPLEMENT)

*[To be filed.]*

# EXHIBIT C

# (FINANCIAL PROJECTIONS)

[*To be filed.*]